2019 IL App (1st) 172459

No. 1-17-2459

Filed May 30, 2019

Fourth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| LISA INMAN, Individually and as Administrator of the Estate of Jesse Inman, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HOWE FREIGHTWAYS, INC., an Illinois Corporation; HINER TRANSPORT, LLC, a/k/a Hiner Transport, Inc.; and HINER EQUIPMENT, LLC, | ) ) ) | No. 12 L 4183 |
| | ) | |
| Defendants | ) | |
| | ) | Honorable |
| (Howe Freightways, Inc., Defendant-Appellant; and Hiner Transport, LLC, a/k/a Hiner Transport, Inc., Defendant-Appellee). | ) ) ) | James N. O'Hara Thomas J. Lipscomb, Judges presiding. |

_____

JUSTICE BURKE delivered the judgment of the court, with opinion.
Justices Gordon and Pierce[*] concurred in the judgment and opinion.

**OPINION**

¶ 1    As the sun was setting one night in September 2011, James Langholf, a truck driver and

employee of Howe Freightways, Inc. (Howe), was driving his semi-tractor trailer west on

_____

[*]Justice Pierce was substituted for Presiding Justice McBride after oral argument and has read all of the briefs and has listened to the audio recording of the oral argument.

Interstate 80 in Iowa when he began to have engine trouble. He pulled over to the shoulder of the highway and turned off his vehicle. When Langholf could not restart it, he called Howe, who told him to call the manufacturer of his engine. Eventually, Langholf called a towing company, which dispatched Jesse Inman (Inman) and Daniel Walsh in separate tow trucks to tow Langholf's tractor and his trailer, the latter being the storage compartment for the freight. When Inman and Walsh arrived at the scene, Inman parked in front of Langholf and Walsh parked behind Langholf. Shortly thereafter, a semi-tractor trailer driven by Herbert Terrell, an employee and agent of Hiner Transport, LLC, a/k/a Hiner Transport, Inc., and Hiner Equipment, LLC (collectively, Hiner), sideswiped Walsh's tow truck and collided with the back of Langholf's truck. The force of the collision pushed Langholf's truck into Inman's tow truck, pinning Inman between them. As a result of the collision, all four men died.

¶ 2    Plaintiff Lisa Inman, Inman's widow, initiated this lawsuit on her behalf and his estate against several defendants, including Howe and Hiner, and alleged their negligence caused his death. Ultimately, the case proceeded to trial where a jury found that both Howe and Hiner were liable, apportioning their liability at 57% and 43%, respectively, and awarded plaintiff a multimillion dollar verdict.

¶ 3    On appeal, Howe contends that the trial court erred (1) by denying its motion for a judgment notwithstanding the verdict where plaintiff failed to present evidence that showed it proximately caused the injuries to Inman; (2) by denying its motion for a judgment notwithstanding the verdict where the jury's verdict and apportionment of liability was against the manifest weight of the evidence; (3) by granting pretrial discovery sanctions that deemed admitted certain acts by it were negligent; and (4) in its rulings on multiple pretrial motions

*in limine*, including one that barred a witness from testifying that, mere seconds before the accident occurred, Terrell was shirtless but, after the accident, he was wearing a shirt.

¶ 4    Because we find the trial court erred by barring that witness from testifying about his observation of Terrell just seconds before the accident occurred and that evidence, if presented at trial, very likely would have changed the jury's apportionment of liability between Howe and Hiner, we must reverse the jury's verdict and remand this matter for a new trial.

¶ 5                                  I. BACKGROUND

¶ 6                                  A. The Complaint

¶ 7    At one point, this lawsuit had several defendants and included multiple counterclaims, but pertinent to this appeal is plaintiff's fourth amended complaint, where she brought wrongful death and survival actions against Howe and Hiner, by and through their former employees, Langholf and Terrell, respectively.

¶ 8    Plaintiff premised her claims against Howe on several alleged negligent acts or omissions, including Howe's failure to properly repair and maintain Langholf's tractor, Howe's failure to ensure that Langholf completed a safety training course after he had been involved in another accident, Langholf's decision to stop his tractor-trailer on the shoulder of the highway rather than continue driving to the next highway exit, Langholf's failure to use reflective warning triangles behind his tractor-trailer, and Howe's failure to promptly contact a towing company to tow Langholf's tractor-trailer from the highway. Plaintiff premised her claims against Hiner on multiple alleged negligent acts or omissions, including Terrell's failure to keep a proper lookout on the highway, failure to reduce his speed as he approached the vehicles on the shoulder of the highway, and his collision with the vehicles. Plaintiff claimed that, as a proximate cause of one

or more of these negligent acts or omissions, Inman suffered serious injuries that resulted in his death. Both Howe and Hiner denied that either they or their employees had acted negligently.

¶ 9                                                B. Pretrial

¶ 10    Three and a half months before trial, plaintiff filed a motion seeking sanctions against Howe for its failure to produce certain training and maintenance records of Langholf and his tractor before the depositions of Howe's former director of safety and maintenance and its successor director of safety and maintenance. Ultimately, the trial court granted sanctions and deemed admitted three allegations of negligence in plaintiff's then-operative third amended complaint, which were that (1) following a preventable accident, Langholf failed to complete a required safety training course, (2) Howe failed to ensure that Langholf complied with its internal policy of completing the safety training course following a preventable accident but before receiving another dispatch, and (3) Howe and Langholf failed to properly maintain his tractor when they improperly replaced the turbo two weeks before the accident, which caused the tractor to become unsafe for highway operation.

¶ 11    Thereafter, plaintiff filed another motion for sanctions against Howe for its failure to preserve Langholf's tractor engine and turbo. Ultimately, the trial court granted new sanctions and deemed admitted the allegation in plaintiff's now-fourth amended complaint that Howe and Langholf failed to properly maintain the tractor engine, including the turbo, which caused it to become unsafe for highway operation in violation of section 396.7(a) of the Federal Motor Carrier Safety Regulations (FMCSR) (49 C.F.R. § 396.7(a) (2011)). The court also affirmed the deemed admitted allegations from the first sanctions order concerning the safety training.

¶ 12    In the week before trial, now with the trial judge presiding over the case (Judge Thomas J. Lipscomb), Howe filed a motion to reconsider the imposition of discovery sanctions by the motion judge (Judge James N. O'Hara). The trial judge denied the motion.

¶ 13    The parties also filed several motions *in limine*, but relevant to this appeal were plaintiff's motion *in limine* No. 32 and Howe's motions *in limine* Nos. 35 and 37.

¶ 14    Plaintiff's motion *in limine* No. 32 sought to bar eyewitness Franklin Green from testifying at trial that Terrell passed him on the highway before the accident and was not wearing a shirt, but after the accident, when Green went to render aid at the scene, he observed that Terrell was pinned in his seat but wearing a shirt. The trial judge granted the motion and barred this testimony.

¶ 15    Howe's motion *in limine* No. 35 sought, in part, to bar plaintiff's expert witness from offering an opinion that, despite the engine issues, Langholf's truck could have reached the next highway exit. The trial judge denied the motion as it related to this opinion.

¶ 16    Howe's motion *in limine* No. 37 sought to bar, in part, any assertion that a violation of its purported internal policy requiring a driver to complete a safety training course after a preventable accident but before receiving another dispatch established a standard of care that, if breached, constituted negligence. The trial judge denied the motion as it related to establishing a standard of care, relying on the motion judge's earlier sanctions order that deemed admitted the allegation regarding Howe's failure to ensure that Langholf complied with its internal policy of completing the safety training course.

¶ 17    Before trial, the trial judge determined that a high-low settlement between plaintiff and Hiner was made in good faith and dismissed contribution counterclaims between Howe and Hiner. Additionally, before trial, plaintiff voluntarily dismissed Hiner Equipment, LLC.

¶ 18                                                C. Trial

¶ 19                              1. Commercial Trucking and Regulations

¶ 20    At trial, the evidence revealed that Howe and Hiner, as commercial motor vehicle companies, and Langholf and Terrell, as operators of semi-tractor trailers, were required to follow the FMCSR. Langholf owned his tractor but leased it to Howe pursuant to an agreement, under which Howe became fully responsible for the operation of the tractor. As well, under the FMCSR, Langholf was considered an employee of Howe. Multiple FMCSR regulations were presented at trial.

¶ 21    One regulation prohibited the operation of a motor vehicle in a condition likely to cause an accident or breakdown of the vehicle. However, if that vehicle was discovered to be in an unsafe condition while being operated on the highway, the regulation allowed drivers to continue operating the vehicles until reaching the nearest place where repairs could safely be performed, but only if continuing to operate the vehicle was safer than remaining on the highway. There was unanimous agreement among the trial witnesses concerning this regulation. For one, they agreed the regulation allowed drivers to "limp" their vehicle forward, meaning if they had an issue with their engine, but still had power, they could continue driving but at a reduced speed until reaching a point of safety. The witnesses also agreed that being parked on the shoulder of the highway was dangerous and the danger increased the longer the vehicle remained on the shoulder. But the witnesses further noted that being parked on the shoulder was safer than being parked in a lane of traffic.

¶ 22    Another regulation required drivers to keep specific warning devices in their vehicles: three reflective warning triangles or either six fusees or three flares. According to an expert at trial, fusees and flares were much rarer than the triangles because the fusees and flares could

only be used for a finite period of time. Another regulation detailed how the warning devices were to be used. The regulation required drivers who had stopped their vehicles on the shoulder of the highway to immediately activate their hazard warning signal flashers. Within 10 minutes of stopping, drivers were required to place their warning devices in specific locations around their vehicles, the arrangement depending on the type of roadway on which they were located. According to the regulation, hazard warning signal flashers could be used, but not in lieu of the reflective warning triangles, fusees or flares.

¶ 23                                         2. Before the Accident

¶ 24    On September 7, 2011, Langholf was involved in an accident that Howe later deemed to be preventable. Following the accident, Langholf did not complete a safety training course. At trial, David Grimm, who became Howe's director of safety and maintenance in October 2011, testified that, in September 2011, there was no requirement by Howe for its drivers to complete a safety training course following a preventable accident but before receiving another dispatch. However, Grimm agreed that, during a deposition, he testified there was such a policy and, had Howe adhered to it, Langholf would not have received another dispatch until completing the safety training course.

¶ 25    On September 13, 2011, Langholf was driving westbound on Interstate 80 near mile marker 188—close to Grinnell, Iowa—hauling steel coils on a flatbed semi-tractor trailer. That stretch of Interstate 80 was a divided highway, with two lanes of traffic eastbound and two lanes westbound. The highway had slight hills but was fairly straight with no curves. From mile marker 188, the next highway exit westbound was between five and six miles away.

¶ 26    At approximately 5 p.m., Langholf called Howe, where Margaret O'Brien, Howe's director of safety and maintenance at the time, answered. O'Brien told Grimm, Howe's shop

foreman at the time who was training to take O'Brien's position, to take the call. Because Howe used a two-way cell phone, O'Brien could hear the ensuing conversation between Langholf and Grimm. According to both O'Brien and Grimm, Langholf reported that he had engine trouble, pulled onto the shoulder of the highway, and turned off the engine. According to Grimm, Langholf said that he heard a pop accompanied by a shake of his engine, and according to O'Brien, Langholf said that he had black smoke emanating from his tractor. At trial, Grimm agreed that Langholf still had engine power by virtue of him being able to manually drive onto the shoulder. After pulling over, Langholf was unable to restart his engine. Grimm subsequently gave Langholf the number of Cummins, the manufacturing company of his tractor's engine, who had a repair shop in nearby Des Moines, Iowa. Although Grimm's shift was ending at the time he took the call from Langholf, Grimm explained at trial that he gave Langholf the number of Cummins because its employees would have the expertise to troubleshoot his engine issue. The phone call between Grimm and Langholf lasted two minutes, and neither Grimm nor O'Brien called a tow truck for Langholf. At trial, Grimm acknowledged that he should have immediately called the nearest towing company.

¶ 27    At approximately 5:45 p.m., Justin Schwarz, a dispatcher for Hanifen towing company in Des Moines, received a call from Langholf, who needed to be towed to Cummins because his "turbo had gone out." Cummins had apparently given Langholf the number for Hanifen, which was located approximately 53 miles away from Langholf. There were at least two other towing companies closer to Langholf than Hanifen: Doc's in Brooklyn, Iowa, and Barney's in Newton, Iowa. Doc's was roughly 10 miles away from Langholf while Barney's was roughly 24 miles away. But because semi-tractor trailers were extremely large, only heavy duty tow trucks had the

capability to tow them. Doc's had the capability, but there was some evidence at trial that Barney did not.

¶ 28    Schwarz informed Langholf that he would dispatch two tow trucks as soon as possible. Schwarz needed two because, according to Iowa law, one tow truck could not tow both a tractor and its trailer, so he called Walsh and Inman. Walsh, who lived in Des Moines, was home when he received the call, but he needed to drive to Hanifen in order to pick up his tow truck. Inman took the call while finishing another tow job in Altoona, Iowa, near mile marker 142. It is unclear exactly when Walsh and Inman arrived at the scene, but it appears both arrived at some point between 6:30 p.m. and 7 p.m. When Walsh arrived, he parked his tow truck on the shoulder of the highway some 100 to 150 feet behind Langholf truck. When Inman arrived, he parked his tow truck on the shoulder of the highway in front of Langholf's truck.

¶ 29                                     3. The Accident

¶ 30    At around 7 p.m., Elaine Schellhorn was driving her semi-tractor with a side dump trailer westbound on Interstate 80 near mile marker 188. The traffic was "very heavy" and it was "very sunny." The sun was positioned below the visor of her truck, which made it "very hard" for her to see and "probably" affected her vision. Schellhorn was in the right lane adjacent to the shoulder and driving behind Terrell's truck with about three truck lengths between them, which prevented her from seeing ahead of his truck. Schellhorn had been following Terrell for some time but was not exactly sure how long. She was driving roughly 65 miles per hour and estimated Terrell to be driving the same. She had not noticed any erratic driving by Terrell.

¶ 31    Suddenly, Schellhorn observed Terrell's truck fishtail and drive into a ditch on the right side of the road. Based on Terrell's location, her straight-ahead view was obstructed and she could not see the vehicles on the shoulder, and she never witnessed his truck contact any of the

trucks on the shoulder. She also did not recall seeing his truck use a turn signal, use its brakes, slow down, or attempt to move into the left lane immediately before the crash. After the crash, Schellhorn slowed down, stopped on the shoulder and reported the accident. She remained at the scene for three hours after the accident but did not give a statement to the police on the scene.

¶ 32    At around 7 p.m., Green was also driving a semi-tractor trailer westbound on Interstate 80 in the right lane. The setting sun did not affect his vision or view of the road. As Green was driving up a slight elevation on the highway between 60 and 62 miles per hour, he noticed Terrell's truck passing him in the left lane. Green estimated that Terrell was driving between 63 and 70 miles per hour. According to Green, the posted speed limit was 70 miles per hour and the minimum speed was 40 miles per hour. In front of Green on the road was a dump trailer and in front of that truck was a 13-foot van trailer. Because the dump trailer sat lower to the ground, it did not obstruct Green's vision, but the van trailer did at times. At the top of the slight elevation, as Terrell passed Green, Green observed vehicles on the right shoulder between a half mile to a little over a mile away with their lights flashing. From his vantage point, he could see that no parts of the vehicles were protruding over the fog line—the line separating the shoulder of the highway from the lanes of traffic—though he acknowledged at trial that the vehicles could have been right on the fog line. Green did not observe any reflective warning triangles behind the vehicles.

¶ 33    Eventually, Terrell passed the two trucks ahead of Green, after which Terrell moved his truck into the right lane. At this point, Green estimated that his own truck was roughly one-eighth of a mile away from the vehicles on the shoulder. Within seconds of Terrell moving into the right lane and some 8 to 20 seconds after Terrell had passed him, Green observed a plume of steam and debris. Although Green could not see the back of Terrell's truck after it moved into

the right lane and did not know if Terrell had attempted to brake, Green could tell that Terrell did not activate his turn signal, as there was a mid-light on the truck that would have lit up. Prior to the accident, nothing about Terrell's driving caused Green to be concerned, and as far as he could tell, Terrell had moved into the right lane properly. According to Green, had there been glare from the sun, there would have been no trucks to shield Terrell from the glare. Once Green passed the accident, he moved onto the shoulder, parked, and called 911. Afterward, he exited his vehicle and proceeded to the scene of the accident.

¶ 34                                    4. After the Accident

¶ 35    At approximately 7:05 p.m., Poweshiek County Deputy Sheriff Jonathan Cheney and Tisha Miller, an emergency medical technician, received calls about a traffic accident. Cheney immediately drove to the scene, and as he was driving westbound on Interstate 80, he observed that the sun was "very bright" and, at times, "overpowering." Often at that time in the evening, the sun's brightness was so overpowering that, even when Cheney wore sunglasses, he would also have to use his hand to shield the sun. During such conditions, Cheney would often park on the shoulder and perform speed traps because the sun would help conceal his presence.

¶ 36    When Cheney arrived at the scene some 10 minutes after receiving the call, he noticed the lights on the back of Walsh's tow truck were flashing and then immediately began looking for victims. Cheney observed Inman, who was completely covered in a white sheet and laying on his stomach, indicating to Cheney that he had already passed away. However, Cheney observed that Inman's body was moving, so he rushed over to Inman, removed the cover, and saw that Inman was still alive. Cheney comforted Inman until medical professionals arrived.

¶ 37    Emergency medical technician Miller arrived at the scene around 7:16 p.m. and three minutes later encountered Inman lying between his tow truck and Langholf's truck. Although

Inman was pale, his eyes were open, he was conscious, and he was able to communicate with Miller, though not conversationally. Miller observed that Inman's body was mangled with various serious injuries. Inman was placed on a backboard and transported onto an ambulance. Shortly afterward, Inman began to have breathing problems and passed away at 7:52 p.m. Dr. Michele Catellier performed an autopsy on Inman and determined his cause of death was blunt force trauma injuries to the abdomen, pelvis, and extremities. Dr. Catellier noted, however, that his brain and head were intact.

¶ 38                                    5. The Investigation

¶ 39    Iowa State Patrol Sergeant Christopher Starrett, who led the investigation into the cause of the accident, arrived at the scene at 8:11 p.m. He observed that both Inman and Walsh's tow trucks had their hazard lights activated. On Walsh's tow truck, Starrett observed that the left mirror had broken off and there was extensive damage to the left tires. As part of the investigation, Starrett took several photographs of the scene of the accident that night and the following morning as well as several measurements of the vehicles and the road. Many of the photographs he took he later characterized as horrible. The day after the crash when Starrett returned to the scene, he spent three or four minutes there and observed for the first time gouge and scrub marks on the ground where Walsh's tow truck had been that were located very close to the fog line. He did not take a photograph of the marks that morning and did not measure them because it was too unsafe with the traffic conditions.

¶ 40    Despite the lack of physical measurements, Starrett visually estimated the distance from the gouge and scrub marks to the roadway and determined that Walsh's tow truck was about 6 to 12 inches off the road, though he did not attempt to determine how far Walsh's left mirror would have been from the roadway. Starrett likewise visually estimated where Langholf's vehicle was

in relation to the roadway and determined it was about two feet away. The shoulder itself was 10 feet wide. At trial, Starrett testified that, although he did not observe the gouge and scrub marks on the ground the night of the accident, one photograph he took that night revealed marks on the ground. Starrett further testified that, in the photograph, there was a mark on the fog line, but he never determined what it was.

¶ 41 As part of Starrett's investigation, he interviewed three witnesses: Schellhorn, Green, and Dawn Rietman, who other evidence at trial indicated was behind Terrell's truck in the left lane shortly before the accident. Schellhorn reported that the sun was in her eyes and terrible, but that she could nonetheless see about 300 feet ahead of her. Green reported that the sun was not an issue for him and that he could see the lights of Walsh's tow truck from about a half-mile to mile away. Rietman, whom Starrett interviewed twice, also reported that the sun was not an issue, but at trial, Starrett agreed that, because she was behind Terrell's truck, there was a strong possibility that his truck shielded her from the sun. In Rietman's first interview, which occurred two weeks after the accident, she stated that Terrell's vehicle had sideswiped Walsh's tow truck, but in her second interview, which occurred three days later, she told Starrett that she did not see Terrell's vehicle sideswipe Walsh's tow truck.

¶ 42 At the conclusion of Starrett's investigation, he determined that Terrell's truck had moved from the right lane of traffic onto the shoulder and sideswiped Walsh's tow truck with the initial point of contact being Terrell's right steering tire against Walsh's left steering tire. When this occurred, the right steering tire of Terrell's truck was cut, causing it to lose air pressure immediately and blow. This caused Terrell's truck to run into the trailer of Langholf's truck, which forced Langholf's truck into Inman's tow truck. Terrell's truck ultimately fell into a ditch. During the collision, Walsh, Inman, and Langholf were all standing in various places on the

shoulder. Though the mirror of Walsh's tow truck broke off, Starrett could not determine when in the chronology of the collision that happened. Starrett did not believe that the reason why Langholf's truck was on the shoulder played a role in the cause of the accident.

¶ 43    At trial, Starrett was unsure if reflective warning triangles had been placed behind Langholf's truck, but he saw no evidence of them and never found any. However, Starrett explained that, in his experience, when a tow truck arrives at the scene behind a semi-tractor trailer, the semi-tractor driver will pick up the warning triangles so that the vehicles can be moved off the highway quickly. Starrett further noted that, while a tow truck's hazard lights could not act as a substitute for warning triangles, such lights nevertheless provided an effective warning for oncoming traffic. Starrett did agree that, had the warning triangles been placed in the appropriate locations, one triangle would have been behind where Walsh ultimately parked his tow truck.

¶ 44                                6. The Trial Experts

¶ 45    Whitney Morgan, plaintiff's expert, worked for the United States Department of Transportation in its Bureau of Motor Carrier Safety, now called the Federal Motor Carrier Safety Administration, as a special agent for several years before starting his own motor carrier safety consulting business. Morgan had been involved in the transportation safety business for over 40 years. Morgan testified that, because it had been deemed admitted that Langholf's engine had been improperly maintained, its compromised function violated the FMCSR. Morgan acknowledged that a compromised vehicle could limp forward to the nearest place of safety if limping forward was safer than remaining on the highway, but he did not see any evidence to suggest that Langholf attempted to limp forward. Morgan, however, conceded that he did not know what exactly went wrong with Langholf's vehicle or what the capabilities of his engine

- 14 -

were and there was no specific evidence to indicate that Langholf could have actually limped along to the next exit. Morgan agreed that, had Langholf's engine been on fire, pulling over would have been proper, but noted though that a blown turbocharger could have caused smoke but would not have caused a fire. Morgan testified that, based on the materials from the case he reviewed, there was no evidence that reflective warning triangles had been placed behind Langholf's truck.

¶ 46    Overall, Morgan determined that Langholf's failure to place the triangles behind his truck, his failure to attempt to exit the highway once his engine began to have issues, Howe's substandard maintenance, and Howe allowing Langholf to be dispatched after a preventable accident without taking a safety training course all contributed to, or caused, the crash and resulting injuries and death to Inman. Regarding Terrell's driving, Morgan identified multiple deviations from the best practices of commercial driving, including Terrell's failure to keep a proper lookout of the road ahead, his failure to practice proper hazard perception, and his failure to slow down as he approached the vehicles on the shoulder. Although Morgan believed that Terrell did not keep a proper lookout, Morgan believed that the setting sun would have impeded Terrell's vision of the trucks' flashing lights. Morgan also believed it was possible that Terrell drove too close to the fog line, which caused his vehicle to sideswipe Walsh's tow truck. Morgan opined that Terrell's deviations from the best practices of commercial driving were also contributing causes to the accident. Morgan agreed that, had Terrell stayed in his lane or moved over to the left lane, the accident would not have happened, at least with Terrell initiating it.

¶ 47    James Whelan, Howe's expert, was a mechanical engineer and accident reconstructionist, who had investigated or reconstructed hundreds of accidents over his career, including many involving trucks. Based on his review of the materials in the case, Whelan determined that,

before the accident, Walsh's tow truck was parked on the shoulder eight or nine inches away from the fog line and not parked crookedly. Whelan acknowledged that, when Walsh would have opened the door of his tow truck, the door would have been in a lane of traffic and that it was possible Walsh's left mirror was over a lane of traffic. But Whelan noted that, according to a postaccident statement from Franklin Green, there was enough room for someone to walk between Walsh's tow truck and the fog line. Whelan determined that Langholf's vehicle was parked on the shoulder nearly two feet away from the fog line.

¶ 48    As for the accident itself, Whelan concluded that the accident was initiated when Terrell's truck crossed over the fog line, causing it to sideswipe Walsh's tow truck. Although Whelan could not conclusively determine where the initial point of impact was due to the extensive damage on Terrell's truck, Whelan believed it was either the front right bumper or front right steering wheel of Terrell's truck making contact with the back of Walsh's tow truck. After Terrell sideswiped Walsh's tow truck, Terrell lost control of his truck and rear-ended Langholf's truck, which forced that vehicle into Inman's tow truck. Whelan did not believe that the initial impact was between Terrell's front right steering wheel and Walsh's front left steering wheel because of certain paint transfer evidence. Whelan also rejected the notion that the initial impact was with Walsh's left side mirror, explaining that, if true, Terrell would have maintained a straight direction of travel and the chain-reaction collision would not have occurred.

¶ 49    Whelan concluded that Terrell, and only Terrell, caused the accident when he failed to keep a proper lookout of the road ahead of him. According to Whelan, Terrell should have stayed in the left lane when passing by the vehicles on the shoulder or, at the very least while in the right lane, slowed down and stayed in his lane. Because of this, Whelan determined that the reason Langholf ended up on the shoulder played no role in the cause of the accident. Although

Whelan agreed that there was no evidence that the reflective warning triangles had been used, he believed the flashing lights of the tow trucks provided an effective warning to oncoming traffic and based on the circumstances, the vehicles on the shoulder were plainly visible. Concerning Langholf's engine, Whelan noted that Langholf's semi-tractor trailer weighed a combined 72,000 pounds. Using this weight, Whelan performed a horsepower loss calculation and concluded that, with a loss of turbo power, it was "not likely" Langholf's vehicle could have limped along to the next highway exit while maintaining the minimum speed limit. And even if Langholf had attempted to limp along on the shoulder of the highway, it would have still presented a dangerous situation.

¶ 50                                    7. Jury Instructions

¶ 51    After testimony and closing arguments, the trial judge gave the jury several instructions, including that Langholf and Terrell were agents of Howe and Hiner, respectively, and therefore any act or omission on their part was imputed to Howe and Hiner. Concerning the allegations of negligence, the instructions informed the jury that plaintiff alleged Howe was negligent when (1) it failed to ensure that Langholf completed a safety training course following his preventable accident but before receiving another dispatch, (2) it failed to properly repair or maintain the engine of Langholf's tractor, (3) Langholf failed to use reflective warning triangles, (4) Langholf performed diagnostics on the shoulder of the highway, (5) it failed to contact a towing company in close proximity to Langholf, and (6) Langholf chose to stop on the shoulder of the highway while his truck was capable of continuing to operate. Another instruction told the jury that plaintiff's first and second allegations of negligence against Howe had been deemed admitted, but Howe denied the remaining allegations and that any of its alleged acts or omissions, including the two deemed admitted, were a proximate cause of Inman's injuries.

¶ 52    Regarding Hiner, the instructions informed the jury that plaintiff alleged Hiner was negligent when Terrell (1) operated his truck without keeping a proper lookout, (2) operated his truck without reducing his speed to a reasonable rate upon approaching the vehicles on the shoulder of the highway, and (3) hit Walsh's tow truck. The instructions also defined proximate cause and informed the jury of the relevant regulations of the FMCSR. The trial judge further provided the jury with a special interrogatory that asked if any act or omission of Howe proximately caused the injuries and death of Inman.

¶ 53                                    8. Verdict

¶ 54    Following deliberations, the jury returned a verdict finding both Howe and Hiner liable and apportioning that liability at 57% and 43%, respectively. The jury awarded plaintiff $19,010,273 in total damages. Regarding the special interrogatory, the jury answered in the affirmative that an act or omission of Howe proximately caused the injuries and death to Inman. The trial judge subsequently entered judgment in accordance with the jury's verdict.

¶ 55                                    D. Posttrial

¶ 56    Thereafter, Howe filed a posttrial motion primarily arguing that it was entitled to a judgment notwithstanding the verdict because plaintiff failed to establish that the acts and omissions alleged against it proximately caused Inman's injuries and death. In the alternative, Howe argued that it was entitled to a new trial on several grounds, including that (1) the jury's verdict and answer to the special interrogatory were against the manifest weight of the evidence, (2) the motion judge erred in entering the discovery sanctions and the trial judge erred in refusing to reconsider those sanctions, and (3) the trial judge erred with respect to its rulings on plaintiff's motion *in limine* No. 32 and Howe's motions *in limine* Nos. 35 and 37. Further, in the alternative, Howe sought a setoff of the damages award to account for plaintiff's pretrial

settlement with Hiner as well as her pretrial settlement with additional parties. The trial judge ultimately denied Howe's posttrial motion in most respects but did grant Howe a setoff in the amount of $1,275,000 against the total damages award.

¶ 57   Howe timely appealed. Although both plaintiff and Hiner are appellees in this appeal, only plaintiff has filed a brief.

¶ 58                                    II. ANALYSIS

¶ 59                        A. Judgment Notwithstanding the Verdict

¶ 60   Howe first contends that the trial judge erred in denying its motion for a judgment notwithstanding the verdict because plaintiff failed to show that the acts and omissions alleged against it proximately caused the injuries and death to Inman. Howe argues that, despite all of the allegations of negligence, nothing it did or did not do caused Terrell's truck to leave his lane of traffic, cross onto the shoulder, and initiate the chain-reaction collision.

¶ 61   A motion for a judgment notwithstanding the verdict will be granted only where all of the evidence, when viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict could ever stand. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 37. Stated another way, the motion should be granted only " 'when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiff[ ], there is a total failure or lack of evidence to prove any necessary element of the [plaintiff's] case.' " *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006) (quoting *Merlo v. Public Service Co. of Northern Illinois*, 381 Ill. 300, 311 (1942)). As long as there is some evidence that supports the jury's verdict, a judgment notwithstanding the verdict is improper. *Vanderhoof v. Berk*, 2015 IL App (1st) 132927, ¶ 62.

We review the trial court's denial of a motion for a judgment notwithstanding the verdict *de novo*. *Lawlor*, 2012 IL 112530, ¶ 37.

¶ 62    As both plaintiff's survival and wrongful death actions were based on negligence, she was required to prove that (1) Langholf and Howe owed a duty of care, (2) Langholf and Howe breached that duty of care, and (3) the breach was the proximate cause of Inman's injuries or death. *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 256 (1999). Howe has not contested the first two elements, but instead focuses on the proximate cause element, which generally "is defined as a cause that, in the ordinary course of events produced the plaintiff's injury." *Atchley v. University of Chicago Medical Center*, 2016 IL App (1st) 152481, ¶ 45. Ordinarily, the determination of proximate cause is a question of fact to be determined by the trier of fact, though when the facts proven at trial do not legally entitle the plaintiff to a recovery, the court may rule on proximate cause as a matter of law. *Abrams v. City of Chicago*, 211 Ill. 2d 251, 257-58 (2004). Proximate cause has two components: cause in fact and legal cause. *Turcios v. The DeBruler Co.*, 2015 IL 117962, ¶ 23.

¶ 63    Cause in fact examines the reasonable certainty that the defendant's conduct caused the injury. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455 (1992). There may be more than one proximate cause of an injury (*Rivera v. Garcia*, 401 Ill. App. 3d 602, 611 (2010)), and that cause "need not be the only, last or nearest cause; it is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes injury." *Leone v. City of Chicago*, 235 Ill. App. 3d 595, 603 (1992). When an injury does not result directly from the conduct of the defendant, but rather a subsequent, independent act of a third party, we utilize the substantial factor test to determine if cause in fact exists. *Kramer v. Szczepaniak*, 2018 IL App (1st) 171411, ¶ 27. Under this test, the defendant's conduct will be considered a cause if it "was

a material element and a substantial factor in bringing about the injury." *Young v. Bryco Arms*, 213 Ill. 2d 433, 446 (2004). A defendant's conduct is a material element and substantial factor in causing an injury "if, absent that conduct, the injury would not have occurred." *Abrams*, 211 Ill. 2d at 258.

¶ 64    When dealing with the possible concurrent negligence of multiple parties, our supreme court has warned that we must distinguish between the cause of an injury and a condition that merely made the injury possible. *Galman*, 188 Ill. 2d at 257. Under the cause-condition dichotomy, if the alleged negligent acts only "furnish a condition by which the injury is made possible, and that condition causes an injury by the subsequent, independent act of a third person, the creation of the condition is not the proximate cause of the injury." *Id.* Distinguishing between the two, however, is essentially the same analysis we employ in determining if cause in fact exists. *Kramer*, 2018 IL App (1st) 171411, ¶ 31.

¶ 65    In discussing cause in fact, *Galman* is instructive. There, a truck driver illegally parked his tanker truck on the street 41 feet from the intersection with another street. *Galman*, 188 Ill. 2d at 254. A student was leaving a nearby high school and instead of crossing the street at the crosswalk, she attempted to cross in the middle of the block in front of the tanker truck. *Id.* While crossing, she was struck by another vehicle whose view was obstructed by the presence of the tanker truck. *Id.* at 255. The student died, and the plaintiff, on behalf of the decedent's estate, sued the truck company and its driver, arguing that their negligence from illegally parking the truck was a proximate cause of the decedent's death. *Id.* 255-56. The defendants argued that the parked truck did not proximately cause the decedent's injuries because it merely furnished a condition by which the injury was made possible and instead, the decedent's negligent

jaywalking and the driver's negligent driving were intervening and superseding causes of her injuries. *Id.* at 257.

¶ 66    Our supreme court reviewed the issue of proximate cause and initially noted that the cause-condition dichotomy was merely another way of presenting the cause-in-fact analysis. See *id.* at 259. The court then discussed whether cause in fact existed and concluded that, had the truck driver not parked his truck illegally on the street, the decedent's "injuries almost certainly would not have occurred." *Id.* at 260. Although she may have still crossed the street in the middle of the block, without the obstruction of the truck, the decedent would have had a clear view of the roadway and "presumably would have timed her crossing to avoid a collision." *Id.*

¶ 67    In this case, had Langholf and Howe's conduct that resulted in Langholf's truck being on the shoulder of the highway or had their conduct that kept Langholf's truck on the shoulder of the highway for some two hours not occurred, Inman certainly would not have been injured and died. Had Howe adhered to its purported policy of requiring drivers to complete a safety training course following a preventable accident but before receiving another dispatch, Langholf would not have been on road that day. Had Howe properly maintained or repaired Langholf's tractor, including the engine and turbo, Langholf would not have been forced to pull over onto the shoulder of the highway. Had Howe contacted a local towing company immediately after Langholf pulled onto the shoulder of the highway, such as Doc's, which was only 10 miles away and had the capability to tow a semi-tractor trailer, Inman would not have been dispatched to tow Langholf's truck and Langholf's truck would have very likely been off the highway around 7 p.m. when the accident occurred. Had Langholf limped forward on the highway, which there was some evidence he could have done based on still having engine power, rather than pulling onto the shoulder, Langholf clearly would not have been on the shoulder of the highway. Lastly, there

was some evidence presented that, had Langholf used reflective warning triangles, the accident could have been avoided given the extreme glare of the sun that day, which might have masked the tow trucks' hazard lights. In sum, although we do not know which of the alleged negligent conduct of Langholf and Howe the jury determined to have proximately caused Inman's injuries, it is clear that Howe and Langholf's conduct was a material and substantial factor in causing them. Consequently, cause in fact exists in this case.

¶ 68     Now we turn to the second component of proximate cause, legal cause, which requires an analysis of foreseeability and "whether the injury is the type of injury that a reasonable person would see as a 'likely result' of his or her conduct, or whether the injury is so 'highly extraordinary' that imposing liability is not justified." *Turcios*, 2015 IL 117962, ¶ 24 (quoting *Lee*, 152 Ill. 2d at 456). Stated another way, "legal cause[ ] is established only if the defendant's conduct is so closely tied to the plaintiff's injury that he should be held legally responsible for it." (Internal quotation marks omitted.) *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 395 (2004). When one party's negligence is premised upon the subsequent negligent act of a third party, as is the case here, the critical question is whether the intervening cause was of a type that a reasonable person could conclude as a likely result of his conduct. *Galman*, 188 Ill. 2d at 259.

¶ 69     Howe acknowledges that the accident may not have happened without the presence of Langholf's truck on the shoulder of the highway. Regardless, however, Howe argues that the circumstances did not establish it was the legal cause of the accident because it was not reasonably foreseeable that, a result of it and Langholf's conduct, Terrell would veer from a lane of traffic onto the shoulder of the highway, collide with a clearly visible tow truck, and cause the

injuries and death to Inman. Citing to *Galman*, Howe posits that that Terrell's actions were entirely of his own making.

¶ 70    In *Galman*, although our supreme court found cause in fact existed, it still had to determine whether the illegal parking of the truck was the legal cause of the decedent's injuries. *Id.* at 260. The court posed the specific question of whether it was reasonably foreseeable that illegally parking in the middle of the road "would likely result in a pedestrian's ignoring a marked crosswalk at the corner, walking to mid-block, and attempting to cross a designated truck route blindly and in clear violation of the law." *Id.* at 261. Answering that question, the court concluded that the decedent's decision to jaywalk "was entirely of her own making" and the defendants could not have reasonably foreseen her decision as a result of parking illegally. *Id.*

¶ 71    However, what is reasonably foreseeable is a context-dependent inquiry. See *Kramer*, 2018 IL App (1st) 171411, ¶ 47. The context in this case was an extremely dangerous scenario: large vehicles on the shoulder of the highway in the direction of travel of a setting sun. At trial, not one witness, including Howe's own, disputed the notion that being parked on the shoulder of the highway, particular for a large semi-tractor trailer, was extremely dangerous. Howe and Langholf's conduct left his truck in a position of danger for not only himself but to Inman and Walsh and oncoming drivers, such as Terrell. Langholf's stopping in a place of danger was exacerbated by the circumstances. Schellhorn considered the traffic on Interstate 80 that evening to be heavy, and the sun was setting directly in the eyes of westbound drivers. Though Green and Rietman, westbound drivers at the time of the accident, did not believe the sun affected their vision, Schellhorn and Cheney remarked that the sun was terrible. Given the combination of the location of Langholf's vehicle and the conditions during the evening of the accident, the circumstances were ripe for an accident to occur.

¶ 72    Though drivers, especially truck drivers as the evidence in this case established, are required to maintain control of their vehicles and keep a proper lookout for obstacles in the road ahead, common experience shows that drivers do not always do so. See *Martinelli v. City of Chicago*, 2013 IL App (1st) 113040, ¶ 30 (observing that "it is well known that people do various things that lead to distracted driving," including "spilling a drink; dropping a cigarette; reaching for an item of food or drink; applying makeup; looking at a map; looking for loose change on the seat; or looking away from the roadway for any number of other reasons"). Obviously, in this case, Terrell did not survive the crash, and no one will know why he veered from his lane of traffic onto the shoulder and collided with Walsh's truck. But highway drivers veer away from their lanes of traffic for a multitude of reasons. See *Vosbein v. E.T. Simonds Construction Co.*, 295 Ill. App. 3d 427, 430 (1998) (finding it was reasonably foreseeable that a vehicle would leave the interstate highway and enter the grassy median between the divided highway). Not all of these driving mishaps result in traffic accidents but surely many do. It is reasonably foreseeable that a large truck driving upwards of 70 miles per hour could veer from its lane of traffic momentarily.

¶ 73    This risk is amplified during certain circumstances, as exemplified by this court's decision in *Smith v. Armor Plus Co.*, 248 Ill. App. 3d 831, 832 (1993), which involved a collision between a truck and another vehicle on the highway. The defendant had parked his truck on the shoulder of the highway after it became disabled and abandoned it but failed to place any warning devices on the road. *Id.* at 833, 835. The truck was completely off the roadway with its rear wheels actually in the grassy area of the highway. *Id.* at 834. That day, it had been snowing, heavily at times, and there was evidence that the roadway was icy. *Id.* at 834-35. However, closer to the time of the accident, there was evidence that the highway was clear of snow and no

longer icy. *Id.* at 836-37. At around 12:40 a.m., another vehicle collided with the truck in which the passenger was killed. *Id.* at 833. The plaintiff, on behalf of the decedent, sued the truck driver and his employer, alleging that the decedent's injuries were the result of the truck driver's failure to remove the truck from the shoulder within a reasonable time, failure to place warning devices behind the truck as required by law, and parking of the vehicle on the shoulder rather than the nearest tollway oasis. *Id.* The trial court granted summary judgment for the defendants, finding that as a matter of law their actions did not proximately cause the decedent's injuries. *Id.* at 839.

¶ 74    The appellate court reversed, finding the evidence adduced at that stage in the litigation created a triable issue of material fact as to whether the truck driver's decision to abandon his vehicle "on the shoulder during serious weather conditions without the use of statutorily required warning devices constituted a proximate cause of the collision." *Id.* at 840, 844. The court asserted that "[t]he mere fact that the truck was entirely off the roadway at the time of the collision [was] not dispositive" of the issue of proximate causation given "the very existence of the statutes requiring the use of warning devices when trucks are disabled on a shoulder." *Id.* at 841. As such, the truck's location did "not by itself demonstrate that the danger caused by its presence was not reasonably foreseeable." *Id.* The court further found that "[i]t might be reasonably anticipated that during weather conditions impairing visibility a vehicle might for some reason temporarily stray across the line of the shoulder and strike an unlighted truck parked in proximity to the lane of traffic." *Id.* Although it was unknown why the driver crossed onto the shoulder, the court concluded "it is not clear that the accident was the result of any unforeseeable or extraordinarily careless behavior on his part" given the conditions. *Id.* at 843.

¶ 75    Though in *Smith*, the appellate court reversed in part based on the truck being unlit, the critical analysis from that decision is the finding that the facts and circumstances are critical in

making a decision on proximate cause. See also *Kramer*, 2018 IL App (1st) 171411, ¶ 47 (finding that, in a legal cause analysis, "[t]he context matters" and "[t]he facts matter"). In this case, while all of the trucks on the shoulder of the highway had various lights activated, there was evidence presented at trial showing that those lights could have been obscured by the glare of the sun. Notably, federal law required truck drivers to be equipped with reflective warning triangles, flares, or fusees and to use those warning devices, which the evidence established was most often the triangles, when their trucks have stopped on the shoulder of the highway for more than 10 minutes, regardless of whether their hazard warning signal flashers had been activated (49 C.F.R. §§ 392.22, 393.95 (2011)). These regulations are a recognition that, by themselves, hazard lights, do not obviate the risk associated with highway accidents involving stopped trucks. See *Smith*, 248 Ill. App. 3d at 841 (finding that, given "the very existence of the statutes requiring the use of warning devices when trucks are disabled on a shoulder, the fact that the truck was entirely off the roadway does not by itself demonstrate that the danger caused by its presence was not reasonably foreseeable"). This is not a case where a truck was parked on the side of some rarely traveled country road, this case involved the heavily trafficked Interstate 80. With the abundance of drivers moving at high rates of speed and the prevalence of distracted driving, "some 'negligent driving' could be reasonably foreseeable." *Kramer*, 2018 IL App (1st) 171411, ¶ 59. When Terrell unfortunately provided that negligent driving, it interacted with the concurrent negligence of Langholf and Hiner to proximately cause Inman's injuries and death.

¶ 76    Although Howe maintains that it and Langholf's conduct did nothing more than furnish a passive condition by which Inman's injuries were made possible rather than furnish a cause of his injuries, this distinction only carries weight "where the forces set in operation by the defendant have come to rest in a position of apparent safety, and some new force intervenes."

*Shank v. Fields*, 373 Ill. App. 3d 290, 294 (2007). Langholf and Howe's conduct never resulted in his tractor trailer coming to a position of apparent safety. Rather the exact opposite is true: their conduct resulted in his tractor trailer being placed in a position of danger. See *Duncan v. Rzonca*, 133 Ill. App. 3d 184, 204 (1985) (observing that the " 'forces set in operation,' " or the first negligent act, only come to rest in a position of apparent safety "when the risk of harm to the plaintiff created by the defendants' alleged negligence had passed").

¶ 77   Howe also has highlighted multiple cases, in particular *Salinas v. Werton*, 161 Ill. App. 3d 510 (1987), *Long v. Soderquist*, 126 Ill. App. 3d 1059 (1984), and *Sheehan v. Janesville Auto Transport*, 102 Ill. App. 3d 507 (1981), where, according to it, this court purportedly found that a vehicle stopped on the road off a lane of traffic was not the proximate cause of a traffic accident as a matter of law. But we find those decisions distinguishable.

¶ 78   *Sheehan*, 102 Ill. App. 3d at 509, involved a semi-tractor trailer parked in a curb lane of a city street at close to midnight, which presents far different circumstances than what occurred here of a semi-tractor trailer parking on the shoulder of a highly trafficked highway during the early evening hours. *Long*, 126 Ill. App. 3d at 1061, likewise is factually distinguishable, where two vehicles had pulled over partially onto the shoulder of an icy highway and later were hit by the driver of another vehicle who had slipped on the ice and lost control of the vehicle. The appellate court concluded that the actions of the drivers on the shoulder could not be a proximate cause of the other driver and his passenger's injuries because their vehicle had slipped on ice and the driver could not have avoided a collision and injuries, even if the driver knew of the presence of the vehicles on the shoulder. *Id.* at 1064. Conversely, in this case, there was ample evidence presented that, had Langholf and Howe acted differently, no crash would have occurred.

¶ 79    Lastly, in *Salinas*, 161 Ill. App. 3d at 512-13, the defendant drove his tow truck, in which the plaintiff's decedent was a passenger, onto the shoulder of the highway to tow out a vehicle in a ditch. While the defendant activated his emergency lights, he did not utilize any flares. *Id.* The decedent was standing behind the tow truck on the shoulder when a van drove off the road, hitting and killing him. *Id.* The plaintiff sued, alleging that the defendant had a duty to place warning flares behind his truck and his failure to do so was a proximate cause of the decedent's injuries. *Id.* at 514. The trial court entered summary judgment in favor of the defendant, finding that he could not be considered a proximate cause of the injuries as a matter of law. *Id.*

¶ 80    On appeal, the appellate court agreed, initially observing that the plaintiff had attempted to establish that the defendant's failure to use flares prevented the driver of the van from slowing down and thereby caused him to veer off the road and into the decedent. *Id.* at 515. However, the court found the plaintiff's causal inference was unsupported by the record because her expert admitted in his deposition that, in forming his opinion about the failure to use flares, he did not consider any information regarding the speed of the van. *Id.* Thus, any inference that using flares would have caused the van to slow down was pure speculation. *Id.* Additionally, the appellate court noted that the record was devoid of any evidence as to why the van left the road and thus, the plaintiff had failed to establish a causal connection between the defendant's failure to use flares and the decedent's injuries. *Id.* at 515-16.

¶ 81    In contrast to *Salinas*, here, the lack of reflective warning triangles was only one possible cause of the accident. In addition, the lack of triangles being a cause of the accident was not *completely* speculative, as plaintiff presented some evidence through its expert Whitney Morgan that, had the triangles been used, the collision could have been avoided. What weight the jury

ascribed to such an opinion is another question, but there was some evidence presented on the matter.

¶ 82    In sum, the evidence in this case supported the jury's conclusion that Howe's conduct together with the act of Terrell hitting the tow truck proximately caused Inman's injuries and death. Accordingly, the trial judge properly denied Howe's motion for a judgment notwithstanding the verdict.

¶ 83                    B. Jury's Verdict and Special Interrogatory

¶ 84    Howe next contends that the trial judge erred in denying its motion for a new trial where the jury's general verdict, including its apportionment of liability, and its answer to the special interrogatory on proximate causation were against the manifest weight of the evidence.

¶ 85    When presented with a motion for a new trial, the trial court must weigh the evidence and determine if the jury's verdict is contrary to the manifest weight of the evidence. *Lawlor*, 2012 IL 112530, ¶ 38. A verdict will be considered against the manifest weight of the evidence only when "the opposite result is clearly evident or where the jury's findings are unreasonable, arbitrary and not based upon any of the evidence." *Id.* And we will not reverse the court's ruling on such a motion "unless it is affirmatively shown that the trial court abused its discretion." *Id.*

¶ 86    In this case, the jury found both Howe and Hiner to be liable for Inman's injuries and death, and apportioned the liability between them at 57% and 43%, respectively. Given the facts of this case, which clearly demonstrated that Howe and Langholf failed to meet their standard of care through multiple actions and omissions, and the jury's proper finding that any one of the acts or omissions proximately caused Inman's injuries, there was no basis for the trial judge to conclude that the opposite result was clearly evident or the jury's findings were not based on the evidence. Although the judge may have apportioned the liability between Howe and Hiner

differently than the jury in this case, there was ample evidence at trial to support the jury's verdict and its answer to the special interrogatory. Consequently, the trial judge properly denied Howe's motion for a new trial on this basis.

¶ 87                                C. Discovery Sanctions

¶ 88    Howe next contends that the motion judge abused his discretion in ordering the discovery sanctions and the trial judge erred when it refused to reconsider those sanctions. Before addressing the specific arguments made by Howe related to the sanctions, we must provide a background of the discovery in this case.

¶ 89                                1. Discovery Background

¶ 90    The fatal collision occurred in September 2011, and plaintiff initiated her lawsuit in April 2012. Three months later, in July 2012, plaintiff propounded written discovery on Howe and sought all records, including maintenance documents related to Langholf's tractor and all training and educational materials provided to Langholf. In response, Howe produced hundreds of documents. Of those documents, 10 pages related to maintenance of the tractor, including a 1-page maintenance report dated August 30, 2011, detailing that someone had tested Langholf's turbo, "found shaft loose" and replaced the turbo in addition to other work. The report did not mention who had performed the work. Also included was another one-page maintenance report dated September 6, 2011, detailing that the lift pump of Langholf's tractor had a bad wire and was repaired. That report also did not mention who had performed the work. Only one document pertained to Langholf's safety training: a February 2011 e-mail from O'Brien, Howe's former director of safety and maintenance, to its third-party training contractor requesting an account be set up for Langholf so that he could complete safety training courses.

¶ 91    Years later, oral discovery commenced. In October 2016, Schwarz, Hanifen towing company's dispatcher on the night of the accident, was deposed and testified that Langholf had called seeking a tow because he thought his turbo had blown. The following month, O'Brien was deposed, wherein she testified that Howe required its tractors to be inspected every 60 days and 60-day inspection reports should have been produced if requested. During the deposition, plaintiff's counsel gave O'Brien the maintenance reports that Howe had produced, and O'Brien agreed that no inspection reports were included. O'Brien also testified that Howe worked with a third party who provided training that its drivers were required to complete monthly.

¶ 92    After O'Brien's deposition, Grimm, her successor, was deposed. He testified that Howe maintained 60-day inspection reports, where it would document various issues with its tractors and general maintenance. According to Grimm, Langholf had purchased his tractor in the spring of 2011, and it underwent an annual inspection in May 2011, meaning that a 60-day inspection report was required in July and September 2011. Grimm also testified that, based on regulations from the United States Department of Transportation, he only had to keep certain logs for six months and certain maintenance records for one year. Based on these regulations, Grimm acknowledged that he "probably" purged records specific to Langholf's tractor at some point after the accident, including any 60-day inspection reports, resulting in only 10 pages of maintenance records being produced to plaintiff. Although Howe enacted a policy to keep such records after a fatal accident beginning around 2014, Grimm was unsure if a similar policy existed in 2011-13. Grimm additionally discussed various safety protocols of Howe, including that Langholf was required to complete monthly training courses and reports were generated showing the completion of the training. Lastly, in September 2011, according to Grimm, Howe

had a policy following preventable accidents that required its drivers to complete additional training before being dispatched again.

¶ 93    Following Grimm's deposition, plaintiff propounded an additional request for production on Howe. On January 12, 2017, the parties entered into an expert witness disclosure schedule, which required plaintiff's disclosures within a month. In court that day, Howe produced hundreds of additional documents concerning, in part, maintenance to Langholf's tractor and his safety training. With regard to the latter, Howe provided documents related to the monthly training required to be completed by its drivers, including logs specific to Langholf.

¶ 94    With regard to the maintenance of Langholf's tractor, Howe provided several records, such as a 60-day inspection report from July 2011 that detailed repairs performed and data related to his tires and brakes. Additionally, there was a day planner with numerous references to Langholf's tractor and maintenance on it from May 2011 to September 2011. There were also the one-page maintenance reports dated August 30 and September 6, 2011, that had previously been provided as well as work orders and tractor assessment and repair forms from those dates.

¶ 95    Concerning the August 30, 2011, work performed on the tractor, the descriptions of the work performed differed between the previously provided maintenance report and the newly provided work order. In the maintenance report, the work was described as, "Driver stated coolant lose. Found oil cooler. Replaced part. Test turbo found shaft loose. replaced turbo. Found exhaust soot in front 3 cylinders. Pulled injectors. found one bad and replaced. Redid all injector o-rings. Ran rack." In the work order, it listed the "Condition or Problem" as "Coolant leak on engine" and described the work as

> "Driver stated coolant lose [*sic*]. Checked oil cooler and found oil in housing, pulled
>
> aprat [*sic*] and cleanned [*sic*] and order new parts. Pulled turbo to get to cooler. Found

turbo had play in shaft, replaced turbo. Pulled valve cover to check injectors, front exhaust was wet. Found number one injector leaking and replaced. Changed all o-rings on injectors since cams wherre [*sic*] pulled. Ran over head. Filled with coolant. Pb#5-212410009, wkww707241, w707442, w707220, w707233."

The work order also provided the name of the mechanic (Grimm) who serviced Langholf's tractor, whereas the maintenance report did not. Moreover, there were two tractor assessment and repair forms from that time period, one dated August 29 and 30, 2011, and one dated just August 30, 2011. The former form noted the name of the mechanic (Jaron) who serviced Langholf's tractor and contained notes stating: "installed lower coolant hose," "filled coolant" and "installed flex pipe to turbo." The latter form noted the name of the mechanic (Mark) who serviced Langholf's tractor and contained notes stating, "1 box," and a word that is illegible.[1]

¶ 96    Concerning the September 6, 2011, work, the descriptions of the work performed varied slightly between the previously provided maintenance report and the newly provided work order. In the maintenance report, the work was described as, "Truck came in on check engiune [*sic*] light. Found bad wire for lift pump. Repaired, advise driver what was done." In the work order, it listed the "Condition or Problem" as "Check engine light" and described the work as "Hooked up computer for codes. Found lift pump code. Repaired harness wire. Gave driver a light." Additionally, the work order provided the name of the mechanic (Mark Smith) who serviced Langholf's tractor, whereas the maintenance report did not. Moreover, the tractor assessment and repair form for September 6, 2011, noted the name of the mechanic (Mark) who serviced Langholf's tractor and contained notes stating "comp hook up," "repaired lift pump harness," "order repair harness," and "driver took light with him."

---

[1] The last names of the mechanics were not included on many of the documents.

¶ 97                    2. First Motion for Sanctions

¶ 98    On January 26, 2017, based on the additional discovery provided by Howe and with the scheduled trial date just over three months away, plaintiff filed an emergency motion seeking Illinois Supreme Court Rule 219 (eff. July 1, 2002) sanctions against Howe for its alleged willful failure to produce the additional training and maintenance records before the depositions of O'Brien and Grimm. Plaintiff asserted that Howe's failure to produce these documents before the depositions had prejudiced her and, because it had not provided a plausible explanation for the untimely production, sanctions were warranted. Plaintiff requested that the motion judge strike Howe's answer to her then-third amended complaint. Hiner also joined in the motion.

¶ 99    Howe responded, acknowledging that the documents were responsive to plaintiff's initial discovery requests but argued that its failure to produce the records was due to the mistaken belief of Grimm, who believed that the records had been purged. Because of this, Howe asserted that its failure to produce the records initially was not deliberate. But, in any event, Howe argued that plaintiff was not prejudiced by the late production because the records were duplicative, did not bear on any issue related to proximate cause, it voluntarily offered to reproduce both O'Brien and Grimm, and it offered to extend the deadline for expert disclosures.

¶ 100   On February 23, 2017, the motion judge entered a written order, initially observing that neither Howe nor its counsel provided a "specific" or "verified explanation" beyond Grimm's apparent mistaken belief as to why the documents were not tendered when initially requested in 2012, or at any other point prior to the depositions of O'Brien and Grimm, and how they were suddenly discovered. The judge then found that Howe's failure to timely produce the records resulted in surprise and prejudice to not only plaintiff, but also Hiner, because the documents were relevant to whether Langholf participated in mandatory training prior to the accident and

pertained to the installation of a turbo in his tractor prior to the accident. Further, the judge determined the timing of the disclosure was harmful to plaintiff and Hiner because multiple witnesses would have to be deposed or redeposed to fully explore the additional issues presented by the documents despite an expert disclosure schedule in place and a trial scheduled to begin in early May 2017. Given this, the judge concluded that plaintiff and Hiner had "been limited in their ability to present a fully informed and thoroughly investigated case," which warranted the imposition of sanctions.

¶ 101   As a result, the motion judge deemed admitted three allegations in plaintiff's then-operative third amended complaint, which were that (1) Langholf failed to complete a required safety course following his preventable accident, (2) Howe failed to ensure that Langholf complied with its internal policy of completing the safety course following his preventable accident and prior to receiving another dispatch, and (3) Howe and Langholf failed to properly install or maintain his tractor.

¶ 102   Also on February 23, 2017, the parties agreed to waive the 60-day deadline set forth in Illinois Supreme Court Rule 218(c) (eff. July 1, 2014) pertaining to the disclosure of witnesses and completion of discovery no later than 60 days before a scheduled trial. Additionally, the motion judge extended the deadline for plaintiff to answer Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2007) interrogatories until early March and later, on the parties' agreement, the expert disclosure deadline was extended to mid-March. In late March 2017, Howe filed a motion to reconsider the sanctions as it related to the maintenance records.

¶ 103                                3. Second Motion for Sanctions

¶ 104   On April 4, 2017, plaintiff also filed a new motion for Rule 219 sanctions against Howe for failing to preserve the tractor, including its engine and turbo. Plaintiff highlighted that she

had alleged against Howe a negligent maintenance and repair claim related to the tractor since the initiation of the lawsuit. She asserted that she did not know that Langholf's tractor had been stored at a facility following the crash, investigated by an insurance expert, and a report had been created detailing the salvage amount to be paid to Howe and its insurance provider, Acuity Insurance (Acuity), until March 28, 2017, when Hiner's counsel provided documents about the salvage of the tractor to her counsel. Based on these documents, plaintiff alleged that Howe, through Acuity, had the tractor towed to a facility in Des Moines for an inspection and eventually to conduct salvage bids. According to plaintiff, additional documentation showed that Acuity had discussions with counsel for Hiner's insurance company about liability and subrogation issues two months prior to plaintiff commencing litigation.

¶ 105 Also, as highlighted by plaintiff, in October 2011, Acuity had issued a check in the amount of $23,350.66 to be paid to "Howe Freightways Inc. Estate of James Langholf & German American State Bank" with the check mailed to "Howe Freightways Inc." in the care of Mark Couper, Howe's chief financial officer. The payment was for the "Total loss of 2001 Kenworth, James Langholf, less $2500 deductible." Based on other documentation included within plaintiff's motion, it appears that Hawkeye Claims Corporation (Hawkeye), a claims adjusting company, worked on behalf of Acuity on several insurance and salvage valuation matters with respect to Langholf's tractor. In November 2011, Hawkeye arranged to have the salvage buyer of Langholf's tractor pick it up from storage, and by February 2012, the tractor had been salvaged. Overall, the majority of the salvage documentation provided to plaintiff by Hiner's counsel reflected communications among Acuity, Hawkeye, and other parties, but not Howe directly, about insurance and salvage issues relating to the tractor. There was one communication in which Howe was directly involved: a May 2016 e-mail from Howe's counsel to Hiner's counsel

about the subrogation issue with respect to Langholf's tractor. Based on Howe's failure to preserve the tractor, which prevented plaintiff from testing the engine and turbo, she requested the alleged negligent acts concerning the turbo and engine be deemed admitted.

¶ 106    Howe responded, arguing that it could not be sanctioned based on the destruction of a tractor that it did not own or have control over. According to Howe, after the accident, the lease agreement between it and Langholf became void due to the doctrine of legal impossibility and ownership of the remnants of the mangled tractor reverted to Langholf's estate. Howe acknowledged that its name appeared on the check issued by Acuity but asserted this was only because of insurance practices where it had been a policyholder and Langholf identified as a Howe driver. Howe contended that plaintiff failed to produce a single document showing it had directed the sale or destruction of the tractor. Instead, Howe asserted that it was Acuity that handled the tractor's salvage on behalf of Langholf's estate.

¶ 107    Howe attached to its response an affidavit from Ken Howe, its president, wherein he averred that Langholf owned the tractor at issue and at no time after the accident did Howe have any ownership, control, or possession of it. Ken Howe further averred that neither plaintiff nor her counsel requested Howe to preserve the tractor or its component parts. Lastly, he asserted that Howe never directed or made any determinations regarding the storage or salvage of the tractor or its component parts, and Howe did not receive any money from the salvage.

¶ 108    On April 28, 2017, while both parties' motions were pending, Grimm was redeposed and Couper was deposed. In Couper's deposition, he testified that, in December 2016, the additional documents regarding Langholf and his tractor were discovered. Couper asserted that most of them were found in a file folder in a file drawer that was "clearly marked" with Langholf's name

and a reference to his accident. Couper presumed the documents had been there since 2011 and speculated that O'Brien and Grimm had both seen the folder at some point before he found it.

¶ 109    In Grimm's second deposition, he agreed that he knew of the existence of the file folder pertaining to Langholf but claimed he made an honest mistake in not turning over the documents in the folder and produced what he thought was asked of him. Grimm also thought the additional maintenance records contained the same narratives as the ones originally produced. He also acknowledged the recently produced logs of monthly training courses completed by Langholf, but asserted that he did not produce those initially because he only gave what was in a file folder, apparently a folder separate from the one pertaining to Langholf and his accident. Grimm also corrected an assertion he made during his first deposition and stated that Howe did not have a policy that required additional safety training after a preventable accident but before another dispatch. Grimm believed that the policy was only implemented after he took over as the director of safety and maintenance in October 2011.[2]

¶ 110    Eventually, on May 5, 2017, a week before the trial actually began, the motion judge entered a written order on plaintiff's second sanctions motion and Howe's motion to reconsider the initial sanctions. The judge found that, regardless of who technically owned the tractor, Howe could have "taken reasonable measures to preserve [it]" due to "the nature of the relationship between Langholf, Howe and [Acuity]." According to the judge, Howe was "in a position to prevent the salvage of the tractor" and knew or should have known that litigation was foreseeable given the reported issues with the tractor that led to it breaking down on the highway. In fashioning the proper sanction, the judge utilized the six-factor test enunciated in *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112 (1998). The judge determined that three

---

[2] Offers of proof at trial by O'Brien and Ken Howe corroborated Grimm's correction.

of the factors—the surprise to plaintiff, her diligence in seeking discovery, and the timeliness of her objection to the evidence—did not favor either party based on the record. The judge next discussed the nature of the evidence and the prejudice to plaintiff, finding that, in light of her allegations, the tractor itself was "central" to her claims against Howe. But now, the judge remarked, her ability to inspect the tractor to support her claim that the tractor had been negligently maintained or repaired was "foreclosed" by its destruction resulting in "severe prejudice" to her. The judge concluded that plaintiff had been placed at "a unique disadvantage in being unable to prove" one of her claims and found sanctions were warranted.

¶ 111 As a result, the motion judge deemed admitted the allegation in plaintiff's now-fourth amended complaint that Howe and Langholf failed to properly repair or maintain the tractor engine, including its turbo. The judge also deemed admitted the corresponding allegations from the third amended complaint now in the fourth amended complaint that were part of the February 23, 2017, sanctions order regarding the safety training. Lastly, because of the new sanctions order, which deemed admitted that Howe negligently maintained or repaired the tractor, the judge found Howe's motion to reconsider moot, as that motion had requested reconsideration of the allegations that were deemed admitted as part of the new sanctions.

¶ 112                    4. Motion to Reconsider Both Sanctions Orders

¶ 113 Three days later, with the trial judge now presiding over the case, Howe filed a motion to reconsider the motion judge's imposition of sanctions. At a pretrial hearing, the trial judge asserted:

"First of all, it's not this Court's—I don't believe it's proper for this Court to reconsider another judge's ruling prior to this case. However, I reviewed it for purposes of seeing if there's anything in there that might strike the Court's attention and might give the Court

pause to deviate from not reconsidering it. So I don't know if that sounds like I reconsidered the motion. I have not. I have reviewed it to take a look at it, and that's as far as I've done with it. So both motions to reconsider are denied."

The other motion to reconsider sought reconsideration of the motion judge's denial of summary judgment for Howe.

¶ 114                                  5. General Verdict Rule

¶ 115   With that background in mind, we now address Howe's contentions. First, it argues that the motion judge erred in ordering the first discovery sanctions because they were unduly harsh given there was no evidence that it deliberately refused to comply with plaintiff's discovery requests or a court order, and the materials untimely produced were cumulative to what had been timely produced. Additionally, Howe argues that the motion judge erred in ordering the second discovery sanctions where it had no duty to preserve Langholf's tractor and no reason to foresee that the condition of the tractor would be relevant to potential litigation. Finally, Howe argues that the trial judge erred when it refused to reconsider the sanctions ordered by the motion judge. Plaintiff, however, posits that not only were the sanctions proper based on the circumstances but that our review of Howe's contentions is barred by the general verdict rule.

¶ 116   Under the general verdict rule, "[w]hen there is a general verdict and more than one theory is presented, the verdict will be upheld if there was sufficient evidence to sustain either theory, and the defendant, having failed to request special interrogatories, cannot complain." *Witherell v. Weimer*, 118 Ill. 2d 321, 329 (1987). The rule is also provided in section 2-1201(d) of the Code of Civil Procedure (735 ILCS 5/2-1201(d) (West 2016)), which states,

> "[i]f several grounds of recovery are pleaded in support of the same claim, whether in
> the same or different counts, an entire verdict rendered for that claim shall not be set

aside or reversed for the reason that any ground is defective, if one or more of the

grounds is sufficient to sustain the verdict."

To this end, plaintiff argues that, assuming *arguendo* that the sanctions were improper, because

Howe did not submit special interrogatories to the jury to ascertain which of the six theories of

negligence against it formed the basis of the jury's verdict, we cannot determine whether the

sanctions affected the verdict. Though Howe acknowledges the general verdict rule, it posits that

the rule is inapplicable, in part, because it could not have propounded a special interrogatory in

proper form that would have tested the basis for the jury's verdict.

¶ 117   A special interrogatory is a question posed to the jury for its consideration during

deliberations that supplements its consideration of the case (see *Simmons v. Garces*, 198 Ill. 2d

541, 555-56 (2002)), such as the one used that asked if any act or omission of Howe proximately

caused the injuries and death of Inman. The purpose of special interrogatory is to test a general

verdict against the jury's conclusion on one or more specific issues of ultimate fact. *Id.* at 555.

When a party requests a special interrogatory, the trial court must provide the jury the

interrogatory so long as the interrogatory is in proper form. 735 ILCS 5/2-1108 (West 2016);

*Northern Trust Co. v. University of Chicago Hospitals & Clinics*, 355 Ill. App. 3d 230, 251

(2004). "A special interrogatory is in proper form if (1) it relates to an ultimate issue of fact upon

which the rights of the parties depend, and (2) an answer responsive thereto is inconsistent with

some general verdict that might be returned." *Simmons*, 198 Ill. 2d at 555. The requisite

inconsistency manifests itself when the special interrogatory is " 'clearly and absolutely

irreconcilable with the general verdict.' " *Id.* at 555-56 (quoting *Powell v. State Farm Fire &*

*Casualty Co.*, 243 Ill. App. 3d 577, 581 (1993)). A proper special interrogatory should be

presented in easily understood terms (*id.* at 563), and must consist "of a single, direct question

that, standing on its own, is dispositive of an issue in the case such that it would, independently, control the verdict with respect thereto." *Northern Trust Co.*, 355 Ill. App. 3d at 251. In other words, a party cannot "piggy-back[ ]" multiple special interrogatories together to ensure that a responsive answer is inconsistent with a general verdict that might be returned. *Id.* at 253.

¶ 118 Although plaintiff argues that the general verdict rule precludes our review of the sanctions and highlights that Howe did not submit a special interrogatory to test the basis of the jury's verdict regarding the different theories of negligence, she does not provide an example of a proper special interrogatory that Howe could have submitted. Howe could not have submitted a special interrogatory in proper form with a single, direct question that would have tested whether the jury found that any of Howe's four not-deemed admitted allegations of negligence were (1) breaches of the applicable standard of care and (2) proximately caused Inman's injuries and death, as opposed to the two deemed admitted allegations of negligence. See *Jacobs v. Yellow Cab Affiliation, Inc.*, 2017 IL App (1st) 151107, ¶ 126 (special interrogatory properly rejected by the trial court where it consisted of two clauses, one regarding a deviation from the standard of care and one regarding proximate causation, which was not answerable with a single "yes" or "no").

¶ 119 On the other hand, had Howe requested separate special interrogatories each testing whether the jury found that Howe had (1) breached its standard of care regarding the four not-deemed admitted allegations of negligence and (2) those breaches proximately caused Inman's injuries and death, each special interrogatory would not have been inconsistent with some general verdict that might be returned and therefore would have been denied by the trial court. See *Northern Trust Co.*, 355 Ill. App. 3d at 252 (finding that, where there were multiple theories of negligence asserted against the defendant, and the special interrogatory at issue addressed only

one, the special interrogatory was not in proper form as a responsive answer would not necessarily be inconsistent with the general verdict). For example, had Howe attempted to determine if Langholf's failure to use the reflective warning triangles was a breach of the applicable standard of care, a "no" response would not necessarily be inconsistent with a general verdict finding Howe liable because the jury could have found any of the other three not-deemed admitted allegations of negligence breaches of the applicable standard of care in addition to the two deemed admitted. In order to be absolutely inconsistent with a general verdict finding, Howe would have had to "piggy back[ ]" multiple special interrogatories together, which is improper. See *id.* at 253. Consequently, because Howe could not have submitted a special interrogatory in proper form to test the basis of the jury's verdict with respect to plaintiff's multiple theories of negligence, the general verdict rule does not preclude our review of the sanctions.

¶ 120                    6. The Law Regarding Sanctions

¶ 121    We now consider whether the motion judge properly imposed the sanctions against Howe. Illinois Supreme Court Rule 219(c) (eff. July 1, 2002) authorizes the trial court to impose sanctions on any party who unreasonably fails to comply with the discovery rules. *Shimanovsky*, 181 Ill. 2d at 120. Rule 219(c) provides a nonexhaustive list of possible sanctions, including barring the offending party from maintaining a particular claim or defense. Ill. S. Ct. R. 219(c) (eff. July 1, 2002). When imposing sanctions, the trial court should balance multiple factors, including the surprise and prejudice to the nonoffending party with the good faith of the offending party in not complying with the discovery rules. *Shimanovsky*, 181 Ill. 2d at 124. But "the sanction imposed should bear some reasonable relationship to the information withheld in defiance of the discovery request." *Smith v. P.A.C.E.*, 323 Ill. App. 3d 1067, 1076 (2001). Although sanctions serve a dual purpose "to combat abuses of the discovery process and

maintain the integrity of the court system," they should be imposed to "promote discovery, not punish a dilatory party." *Locasto v. City of Chicago*, 2014 IL App (1st) 113576, ¶ 27. The "party disputing a sanction order for failure to comply with discovery must establish that noncompliance was reasonable or justified under the circumstances." *In re Estate of Andernovics*, 197 Ill. 2d 500, 510 (2001). The trial court's decision to impose particular sanctions may only be reversed where there has been a clear abuse of discretion (*Shimanovsky*, 181 Ill. 2d at 120), which occurs when its decision is unreasonable or arbitrary, or where no reasonable person would adopt the same view (*Blum v. Koster*, 235 Ill. 2d 21, 36 (2009)).

¶ 122                    7. The Propriety of the First Sanctions Order

¶ 123  We now discuss the first sanctions, where the motion judge deemed admitted plaintiff's allegations in her third amended complaint that (1) Langholf failed to complete a safety course following his preventable accident, (2) Howe failed to ensure that Langholf complied with its internal policy of completing the safety course following his preventable accident and prior to receiving another dispatch, and (3) Howe and Langholf failed to properly maintain his tractor.

¶ 124  Regarding the maintenance allegation, the motion judge explicitly balanced the surprise and prejudice to plaintiff of the untimely disclosure of discovery documents against the good faith of Howe through Grimm, who initially believed he had purged the additional records. The judge noted the relevancy of the documents to plaintiff's negligent maintenance claim and to Hiner's own defense and how the timing impacted both plaintiff and Hiner's ability to thoroughly investigate their cases. Further, the judge highlighted Grimm's apparent mistaken belief that he had purged the additional maintenance documents but emphasized there was no verified explanation as to why these documents once thought to be purged suddenly appeared. In this manner, the judge implicitly determined that Howe failed to show that its noncompliance

with the discovery rules was reasonable or justified under the circumstances. See *In re Estate of Andernovics*, 197 Ill. 2d at 510 (stating that the "party disputing a sanction order for failure to comply with discovery must establish that noncompliance was reasonable or justified under the circumstances"). Grimm's depositions support this finding, where he could not provide a consistent explanation about the documents. In his first deposition, he testified that he likely purged the additional documents. In his second deposition, he seemed to suggest that he knew of their existence all along but withheld them because he honestly did not think he needed to turn them over. Overall, the record reflects a careful balancing of the relevant considerations by the motion judge and a sanction, albeit harsh, that bears a reasonable relationship to the information withheld. We therefore cannot say that, under the circumstances, the sanction was so unreasonable that no reasonable person would adopt the same view.

¶ 125    Howe, however, argues that plaintiff's investigation was not prejudiced by the untimely production because she already knew from its initial production of maintenance records that Langholf's turbo had been replaced and his lift pump repaired days before the accident. Although the one-page maintenance reports from August 30 and September 6, 2011, which had been timely produced, were similar in describing the work performed on Langholf's tractor to the subsequently produced work orders and tractor assessment and repairs forms that bore the same dates, there were some differences in the descriptions. Notably, the August 30, 2011, work order was more detailed than its corresponding maintenance report, and in the work order, the name of the mechanic was listed. In the two tractor assessment and repair forms from that time period, two additional mechanics were listed. Similarly, although the September 6, 2011, work order only varied slightly from its corresponding maintenance report in describing the work performed, the work order provided the name of the mechanic who serviced Langholf's truck

and so did the tractor assessment and repair form from that date. Based on these differences, it was reasonable to find that plaintiff suffered some prejudice and surprise.

¶ 126    Howe also highlights that the motion judge found prejudice in part due to plaintiff being required to disclose her experts soon after the supplemental production yet asserts the judge ignored that, on the same day he entered the sanctions, he extended the deadline for plaintiff to answer Rule 213(f) interrogatories. Even if we were to agree with Howe that the prejudicial effect of its supplemental production was less than that ascribed to it by the judge based on the extension, the fact that the newly produced documents differed in parts from the initially produced documents, coupled with the lack of a consistent explanation for the sudden discovery of the documents, provided the judge clear grounds to deem admitted the allegation related to Howe's maintenance of the tractor. Consequently, the motion judge did not clearly abuse his discretion in imposing this sanction.

¶ 127    However, we do not find the same with regard to the motion judge's sanctions against Howe to deem admitted that Langholf failed to complete a required safety course following his preventable accident and Howe failed to ensure that Langholf complied with its internal policy of completing the safety course following the preventable accident and prior to him receiving another dispatch. As previously discussed, a particular sanction must bear some reasonable relationship to the information that was not originally provided. *Smith*, 323 Ill. App. 3d at 1076. The safety records that were untimely produced did not relate to any internal policy of Howe training its drivers after preventable accidents, which was one of plaintiff's theories of negligence. Rather, the documents related to ongoing monthly training that its drivers were required to complete, which was not a theory of negligence alleged by plaintiff. In this manner, the supplemental production of safety training documents had no reasonable connection to

plaintiff's allegation regarding Howe's internal policy. While there was an overlap in general subject matter, *i.e.*, safety training, the connection must be more than tangentially related. Consequently, the motion judge clearly abused his discretion by imposing such harsh sanctions. However, plaintiff is not precluded from renewing her motion for sanctions, albeit a less harsh one, if it can be shown that the less severe sanction bore some reasonable relationship to the information that was not originally provided.

¶ 128                              8. The Propriety of the Second Sanctions Order

¶ 129   We now discuss the motion judge's second sanctions order, where it continued the sanctions regarding the safety training issues, which we have just found were unwarranted, but also deemed admitted the allegation in plaintiff's fourth amended complaint that Howe and Langholf failed to properly repair or maintain the tractor engine, including the turbo, based on the prelitigation destruction of the tractor.

¶ 130   Generally, "a potential litigant owes a duty to take reasonable measures to preserve the integrity of relevant and material evidence." *Shimanovsky*, 181 Ill. 2d at 121. Otherwise, the potential litigant "could circumvent discovery rules or escape liability simply by destroying the proof prior to the filing of a complaint." *Id.* The preservation of evidence is often most critical in product liability cases where the allegedly defective product is crucial to both the prosecution and defense of the case. *Kambylis v. Ford Motor Co.*, 338 Ill. App. 3d 788, 793 (2003). Because a duty exists for the prelitigation preservation of certain evidence, the trial court has the authority to sanction a party when it destroys relevant and material evidence under Rule 219(c). *Shimanovsky*, 181 Ill. 2d at 122-23. The relevant factors the court should consider in determining whether a sanction is warranted and, if so, the appropriate sanction are the (1) surprise to the adverse party, (2) diligence of the adverse party in seeking discovery, (3) timeliness of the

adverse party's objection to the evidence, (4) nature of the destroyed evidence, (5) prejudice of the destruction of the evidence, and (6) good faith of the party offering the evidence. *Id.* at 124.

¶ 131  In determining the sanctions based on the destruction of the tractor, the motion judge carefully balanced the relevant factors of the *Shimanovsky* test, noting the timeline of events that led up to plaintiff's second motion for sanctions, and we find the judge's determination that three of the factors—the surprise to plaintiff, her diligence in seeking discovery, and the timeliness of her objection—favored neither party to be reasonable. Furthermore, as the judge correctly concluded, it is unquestionable that, given plaintiff's claim concerning the alleged negligent maintenance of Langholf's tractor, including its turbo and engine, the tractor was central to her cause of action against Howe. Because of this, axiomatically, plaintiff was prejudiced because she was unable to test and inspect the tractor to support her negligent maintenance claim.

¶ 132  The real question concerns the final factor, the good faith of Howe, which centered on its ability to prevent the destruction of the tractor. Howe argues that it had no reason to foresee the condition of Langholf's tractor being relevant to potential litigation given that his vehicle was stationary on the shoulder of the highway when the accident occurred. And further, Howe posits that it never had any ownership of the tractor, and it would have been required to take extraordinary measures to retain and preserve the tractor. However, as plaintiff notes, the lease agreement between Langholf and Howe provided Howe with "exclusive possession, use and control" of the tractor and imposed "full responsibility" for the tractor's operation upon Howe. Furthermore, as borne out by an offer of proof at trial from O'Brien, mere weeks after the accident, she had an e-mail correspondence with a representative of Acuity wherein the representative asked her if Howe or the relatives of Langholf were interested in meeting the highest salvage bid for the tractor of $8269. O'Brien testified that, after receiving the e-mail, she

talked to Ken Howe and Langholf's family, but no one wanted to meet the bid. O'Brien wrote Acuity back saying neither the Langholf's family nor Howe was interested. Additionally in O'Brien's offer of proof, she acknowledged that she was tasked by Howe to be a conduit between Acuity and the facility storing the tractor. Given the lease agreement between Howe and Langholf, as well as Howe's ability to purchase the tractor for just over $8000, the motion judge's conclusion that Howe could have taken reasonable measures to preserve the tractor was not unreasonable. See *In re Marriage of Gary*, 384 Ill. App. 3d 979, 987 (2008) (the reviewing court can affirm the trial court on any basis supported by the record).

¶ 133   Howe, however, asserts that no one asked it or Acuity to preserve the tractor prior to litigation. That is irrelevant because Howe, with notice of a fatal accident involving its driver and its equipment, was a potential litigant and had a prelitigation duty to take reasonable measures to preserve the integrity of relevant and material evidence, which the tractor assuredly was. See *Shimanovsky*, 181 Ill. 2d at 121. And it strains credulity for Howe to argue that, as the employer of a truck driver involved in a multivehicle collision that resulted in four deaths in which his vehicle had reported engine trouble, it could not foresee itself as a potential litigant. Additionally, Howe asserts that, because Langholf's tractor was totaled and he passed away, their lease ended due to the doctrine of legal impossibility. See *Innovative Modular Solutions v. Hazel Crest School District 152.5*, 2012 IL 112052, ¶ 37 (stating the doctrine of legal impossibility "excuses performance of a contract only when performance is rendered objectively impossible either because the subject matter is destroyed or by operation of law"). Even if Howe's performance had been excused under the lease agreement, it does not follow that Howe had no duty to take reasonable measures to preserve the tractor.

¶ 134 Because the tractor's destruction prevented plaintiff from being able to inspect the tractor's component parts, including its engine and turbo, two parts critically at issue in the litigation, she was put at an extreme disadvantage in being able to support her claim regarding the negligent maintenance of the tractor. She could only obtain a fair trial on the merits concerning this allegation with the sanction imposed by the motion judge. See *Shimanovsky*, 181 Ill. 2d at 123. The judge's sanction was appropriate given the circumstances, and therefore, he did not clearly abuse his discretion in imposing the sanction.

¶ 135                              9. Trial Judge's Failure to Reconsider

¶ 136 Howe also contends that the trial judge erred by refusing to reconsider the sanctions entered by the motion judge. When the trial judge denied Howe's motion to reconsider, he stated essentially that it was not proper as a matter of law to reconsider the rulings of the motion judge.

¶ 137 "[A] judge acts within the bounds of his or her authority when reconsidering a prior ruling in the same case by a different judge, so long as the record lacks evidence of bad faith or 'judge shopping' by the movant seeking reconsideration." *Swain v. City of Chicago*, 2014 IL App (1st) 122769, ¶ 10. Here, there is no evidence, and the trial judge never found such on the record, that Howe's motion to reconsider was made in bad faith or merely an attempt at shopping judges. Rather, from what can be gleaned from this record, Howe genuinely believed the sanctions were unwarranted, a belief partially validated by our conclusion regarding part of the first sanctions order. Consequently, the trial judge had the authority to reconsider the motion judge's sanctions, and he erred by refusing to do so as a matter of law. If, on remand, Howe renews a motion to reconsider the sanctions, the trial judge may properly entertain the motion insofar as it does not conflict with the rulings herein.

¶ 138                              D. The Motions *in Limine*

¶ 139   Howe next contends that the trial judge erred in various rulings on the parties' motions *in limine*, specifically the grant of plaintiff's motion *in limine* No. 32 and the denials of its motions *in limine* Nos. 35 and 37.

¶ 140   A motion *in limine* allows a party to obtain a pretrial order barring certain evidence from being presented during trial. *Kutchins v. Berg*, 264 Ill. App. 3d 926, 930 (1994). "In this way, the moving party safeguards against the prejudicial impact possibly resulting from asking questions and making objections regarding the inadmissible evidence before the jury." *Id.* In ruling on a motion *in limine* that bars the introduction of evidence at trial, the trial court must exercise caution because barring evidence "may unduly restrict the opposing party's presentation of its case." *Rush v. Hamdy*, 255 Ill. App. 3d 352, 365 (1993). The trial court has considerable deference in ruling on a motion *in limine*, and its decision will not be reversed absent a clear abuse of that discretion. *Swick v. Liautaud*, 169 Ill. 2d 504, 521 (1996).

¶ 141                    1. Plaintiff's Motion *in Limine* No. 32

¶ 142   Plaintiff's motion *in limine* No. 32 sought to bar testimony of witness Green about his observation of Terrell before the accident, namely that he was not wearing a shirt.

¶ 143   During Green's evidence deposition, he testified about the moments before the accident. As Green was driving his truck in the right lane of the highway up a slight elevation, or hill, he noticed Terrell passing him in the left lane. At the time, Green was driving between 60 and 62 miles per hour, and he estimated that Terrell was driving between 63 and 70 miles per hour. Due to Terrell driving faster, Green acknowledged only having a couple of seconds to observe Terrell as he passed. But in that short period of time, Green observed Terrell sitting "catty-corner" on his seat, looking to his right and shirtless. Upon further questioning about his observation, Green denied it was possible that Terrell merely had his shirt open rather than off.

¶ 144   The distance from where Terrell passed Green to the location of the eventual accident was not precisely clear from Green's deposition. But what we can discern is the following: While Green was driving up the small elevation, Terrell was in the process of passing him in the left lane. Green answered "yes" when plaintiff's counsel asked him if he was "about one mile, mile and a half from the crash site" when Terrell passed him. In front of Green were two additional trucks, which Terrell had to pass before moving into the right lane. According to Green, Terrell passed these trucks "towards the top" of the hill, which was "anywhere from a half mile to a little over a mile" away from the vehicles on the shoulder. After passing the trucks in front of Green, Terrell moved into the right lane. At this point, according to Green, his own location was roughly an eighth of a mile away from the vehicles on the shoulder, meaning Terrell was even closer. Seconds after Terrell moved into the right lane, the crash occurred, although Green agreed that, earlier in the deposition, he incorrectly testified that Terrell was in the right lane for a minute before the accident.

¶ 145   Later during the deposition, plaintiff's counsel and Green had the following exchange:

"Q. Okay. And if you're about a mile, mile and a half back from the site of the crash, would I be correct in stating you had about 8 to 12 seconds, at most, from the time that the Hiner vehicle was passing you to the time the crash occurred, based on your speed and the distance between yourself and the crash site?

A. Yeah, 8 to 20 seconds, I believe."

After the accident, Green pulled over and went to the scene to see if anyone needed assistance. On his first pass around the vehicles, he did not look into Terrell's vehicle, but on a second pass, Green did and observed Terrell "pinned in his seat in the sleeper compartment area" with a shirt

on. Though Green made these observations, he also testified that he did not observe any erratic or unusual driving by Terrell prior to the accident.

¶ 146   In support of plaintiff's motion *in limine*, she argued that Green's testimony was too remote to support an inference that he caused the collision by putting on a shirt. Ultimately, the trial judge granted the motion, finding that:

> "[A] mile to a mile and a half before the incident, in this court's view, it would seem that somebody could put their shirt on at any time during that period, and I think it's too remote in time to allow that to be put into evidence. And I understand it's circumstantial and the testimony here is to the fact of the driver having his shirt off and then having his shirt on; however, it's too—there's too much time and space in between the first sighting of the driver without his shirt and the distance in time, as the court perceives it, the time for that truck to go a mile where this driver could have put his shirt on at any one of those—at any time during that period.
>
> Having said that, the court is also concerned that—the question of whether this is circum—valid circumstantial evidence of any negligence here, because if this is admitted, you know, the jury's going to come to a conclusion that, well, he very well could have or may have or probably was putting his shirt on at the time when there's no evidence that that was related to the accident."

¶ 147   Howe argues that the trial judge abused his discretion in granting plaintiff's motion *in limine* where Green's testimony was strong circumstantial evidence that Terrell was putting on his shirt prior to the accident and not too remote to be presented to the jury. Plaintiff, however, initially argues that Howe's contention is barred by the general verdict rule because it failed to

submit special interrogatories to clarify the basis for the jury's verdict and only one of the three negligence allegations against Hiner concerned Terrell's failure to keep a proper lookout. The allegedly erroneous exclusion of Green's testimony about Terrell related not only to plaintiff's allegation that he failed to keep a proper lookout but also clearly concerned her allegations that Terrell failed to reduce speed and he came into contact with Walsh's tow truck. All three allegations are generally based on Terrell's negligent driving. The general verdict rule does not preclude our review of the trial judge's grant of plaintiff's motion *in limine* No. 32. Nevertheless, according to plaintiff, she argues that the judge's ruling was proper.

¶ 148  In the trial judge's ruling, it focused primarily on the remoteness of the evidence. Remoteness is just a component of the traditional relevancy test for evidence. See *People v. Cloutier*, 156 Ill. 2d 483, 501 (1993) ("A trial court may reject evidence on the grounds of relevancy if it is remote, uncertain, or speculative."). The general rule of evidence in Illinois is that relevant evidence is admissible at trial. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). However, relevant evidence will be inadmissible if the probative value of the evidence is substantially outweighed by the risk of unfair prejudice, confusing the issues or misleading the jury. Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 149  Evidence of a driver's conduct prior to an accident may be admitted at trial. *Spencer v. Wandolowski*, 264 Ill. App. 3d 611, 618 (1994). The admissibility of the evidence depends on the degree to which it tends to show what most likely occurred at the time of the accident and is determined by two factors. *Id.* First, the proffered evidence must identify the vehicle as being the same one involved in the accident or the jury must be able to reasonably infer that it was the

same vehicle. *Id.* Second, "the facts and circumstances support a reasonable inference that the conduct testified to continued from the point of observation to the place of the [accident]." (Internal quotation marks omitted.) *Id.* This factor is akin to the remoteness of the evidence. See *id.* at 620. Moreover, "circumstantial evidence may 'take[ ] on more importance where there are no available eyewitnesses, or where it may be the only method by which it may be shown who was at fault.' " *Id.* at 618 (quoting *Klavine v. Hair*, 29 Ill. App. 3d 483, 487-88 (1975)). Each question concerning the admissibility of this type of evidence is unique and must be judged according to its own facts. *Id.*

¶ 150   In this case, there is no dispute that Green's testimony identified Terrell as being the driver of the same vehicle later involved in the crash. The critical question was whether Terrell being shirtless shortly before the accident and wearing a shirt after the accident led to a reasonable inference that putting on a shirt distracted him and may have caused the accident. In ruling on the motion *in limine*, the trial judge focused only on the proximity in distance from Green's observation of Terrell shirtless to the eventual site of the accident, which was somewhere between 1 mile and 1½ miles away. Had there only been this distance revealed in Green's deposition, we would be unlikely to find the judge abused his discretion in excluding Green's observation from trial. See *Flesberg v. Prince Warehouse Co.*, 37 Ill. App. 2d 22, 27-28 (1962) (driver's negligent driving one-half mile away from the scene of an eventual collision too remote to be admissible). But there was more than just a distance. Green also testified to a temporal proximity of only 8 to 20 seconds from the time he observed Terrell shirtless to the crash occurring. The judge overlooked this critical component of the observation.

¶ 151   Had the trial judge also focused on the temporal proximity of Green's observation to the eventual crash, we do not believe he could have rationally found such a short period of time too

remote. It is certainly possible that Terrell could have put a shirt on in 8 to 20 seconds or even in up to a minute despite driving a truck on the highway upwards of 70 miles per hour while passing other vehicles and changing lanes, all while looking into a glaring sun, without it affecting his driving. But it is equally as possible that putting a shirt on during such circumstances affected Terrell's driving to some degree. Given either prospect being well within the realm of possibility, Green's observation was not too remote.

¶ 152   *Spencer* is illustrative. There, a plaintiff, who was injured during a rush hour traffic accident, sued a truck driver and the co-owner of the truck based on the truck driver's alleged improper lane change on the highway's feeder ramp. *Spencer*, 264 Ill. App. 3d at 612. Less than 10 minutes before the accident, a state trooper observed the plaintiff riding his motorcycle on the shoulder of the highway going at least 40 miles per hour. *Id.* at 616, 620. The trial court barred the trooper from testifying about this observation, finding it too remote. *Id.* at 619. On appeal, the appellate court rejected the trial court's finding of remoteness and concluded that less than 10 minutes was a "sufficiently short" period of time to support a reasonable inference that the plaintiff continued riding on the shoulder up until the time of the accident. *Id.* at 620. The appellate court next observed that the defendants' theory was that the plaintiff caused the accident by being in a rush to work and determined the excluded "testimony was central" to that theory. *Id.* at 620-21. Because the excluded testimony "could have affected the verdict or the apportionment of fault," the court concluded "its weight and value should have been determined by the jury" and the prohibition was improper. *Id.*

¶ 153   Here, because no one truly knew what caused Terrell to initiate the chain-reaction collision, any evidence that tended to show that "what" was crucial in determining who was at fault and, if multiple parties were, their respective faults. Notably, Howe's theory of the case

throughout was that Terrell, and Hiner through him, were the only negligent parties because he controlled the only moving vehicle involved in the crash. As in *Spencer*, the excluded testimony of Green, which tended to show that Terrell was distracted while driving, was central to Howe's defense and because the excluded observation was only 8 to 20 seconds before the accident, it was a sufficiently short period of time to support a reasonable inference that Terrell was putting on a shirt while driving and that it could have affected his driving. And even if Green's testimony would not show that Hiner through Terrell was solely at fault, it could have certainly showed that Hiner was more at fault. The excluded testimony of Green was a highly probative piece of evidence that the jury should have been able to consider in its truth-seeking process of determining who was liable for Inman's injuries and death and the apportionment of that fault.

¶ 154    Plaintiff primarily relies on *Eleopoulos v. Dzakovich*, 94 Ill. App. 3d 595 (1981), to support her argument that the trial judge did not err in granting her motion *in limine*. There, a passenger of a vehicle that ultimately hit a child on a bicycle would have testified that the driver looked inside the glove compartment at some unspecified period, though not too long, before the collision. *Id.* at 597, 599-600. The trial court barred this testimony, finding it too remote to have probative value. *Id.* at 600. The appellate court agreed, finding that the passenger could not recall exactly when the driver looked into the glove compartment and therefore, "the plaintiff could not connect this testimony to the relevant time frame." *Id.* Unlike *Eleopoulos*, here, Green's observation of Terrell occurred only 8 to 20 seconds before the accident, well within the relevant time frame. *Eleopoulos* is therefore inapposite.

¶ 155    Additionally, although the trial judge was primarily concerned about the remoteness of the potential evidence, the judge also stated that Green's observation could lead the jury to the conclusion that Terrell had been putting on a shirt at the time of the accident "when there's no

evidence that that was related to the accident." In other words, the judge intimated that Green's observation could mislead the jury. See Ill. R. Evid. 403 (eff. Jan. 1, 2011) (relevant evidence may be deemed inadmissible if its probative value is substantially outweighed by the risk of misleading the jury). We do not believe that the jury would have been misled by testimony on Green's observation. Importantly, merely because the jury would have been presented with this evidence does not mean that the jury had to come to the conclusion that Terrell was putting on his shirt while driving on the highway or that, if he did, it affected his driving. In fact, Green testified that he did not observe any erratic or unusual driving by Terrell prior to the accident.

¶ 156  Had Green been allowed to testify to his observation, he could have been cross-examined about all aspects of it, including if he had previously mentioned to anyone about Terrell being shirtless and whether his testimony of observing Terrell shirtless 8 to 20 seconds before the accident was consistent with his testimony that he was perhaps over a mile away from the eventual scene of the crash. Green's testimony about his observation accompanied by related cross-examination would not have misled the jury but rather given the jury a more comprehensive picture of the events leading up to the collision in a case—a case where no one truly knew why Terrell hit Walsh's tow truck. Consequently, the trial judge clearly abused his discretion by precluding Green from testifying about his observation of Terrell.

¶ 157  While litigants are not "assured a perfect trial," they are assured a fair one. *Department of Transportation v. Dalzell*, 2018 IL App (2d) 160911, ¶ 127. And thus, an evidentiary error does not automatically mandate reversal, as the error may nevertheless be harmless. *Nolan v. Weil-McLain*, 233 Ill. 2d 416, 429 (2009). Harmless error occurs when, despite the presence of an error, it appears " 'no harm has been done.' " *Jefferson v. Mercy Hospital & Medical Center*, 2018 IL App (1st) 162219, ¶ 39 (quoting *Jackson v. Pellerano*, 210 Ill. App. 3d 464, 471

(1991)). Conversely, reversible error occurs when an error "appears to have affected the outcome of the trial." *McHale v. Kiswani Trucking, Inc.*, 2015 IL App (1st) 132625, ¶ 28.

¶ 158   The trial judge's grant of plaintiff's motion *in limine* No. 32 was, by itself, reversible error. The preclusion of Green's testimony about Terrell's appearance before the accident had a potentially dramatic affect on the jury's verdict, specifically its apportionment of fault. This case centered around two potentially negligent litigants, Hiner and Howe, from an accident where much of what Howe did or did not do, individually and through Langholf, was known. But what was unknown were the actions of Terrell. While ultimately his truck initiated the chain-reaction collision, the unanswerable question was why it happened. Obviously, Terrell passed away as a result of the collision and so did Langholf, Inman, and Walsh, leaving the jury to determine what caused the collision based predominantly on the opinions of experts. Some of that speculation could have been mitigated had the jury been allowed to consider Green's observation that, shortly before the accident, Terrell was shirtless and then, shortly after the accident, he was wearing a shirt. While the jury would not have been required to believe Green's testimony about Terrell, or even if it did believe the testimony, come to conclusion that Terrell putting on a shirt caused the accident, the jury was deprived of a potentially critical piece of evidence in determining the respective faults of Howe and Hiner. The jury's inability to consider this significant piece of evidence undoubtedly appears to have affected the outcome of the trial, specifically the comparative fault of Howe and Hiner. See *id.* Accordingly, on this error alone, we must remand for a new trial.

¶ 159   Despite this finding, we still will address Howe's additional two contentions regarding its motions *in limine* Nos. 35 and 37, as they may be relevant upon remand.

¶ 160                     2. Howe's Motion *in Limine* No. 35

¶ 161   Howe's motion *in limine* No. 35 sought, in part, to bar plaintiff's expert witness, Morgan, from offering his opinion that Langholf's truck could have reached the next highway exit where Morgan was not a mechanic and, during his deposition, he admitted he did not have any specific evidence to support this proposition. The trial judge denied the motion as it related to Morgan's opinion, finding that the jury should be able to consider the testimony and give it whatever weight deemed appropriate.

¶ 162   Howe argues that Morgan was unqualified to offer such an opinion and the opinion itself was overly speculative. Plaintiff, however, posits again that the general verdict rule precludes our review of this contention of error. But as we have already discussed, we cannot find the general verdict rule precludes our review in this case. Nevertheless, plaintiff argues that Morgan did not even make such an opinion at trial but rather merely testified that Langholf should have attempted to limp along to the nearest exit. Regardless of the parties' dispute in this manner, our initial inquiry is the propriety of the trial judge's pretrial ruling to allow the opinion of Morgan that Langholf could have reached the nearest exit.

¶ 163   Generally, expert opinion testimony will be admissible if the expert is qualified by experience, skill, knowledge, training, or education in a field with a degree of reliability, and the testimony would aid the jury's understanding of the evidence. *Petraski v. Thedos*, 382 Ill. App. 3d 22, 28 (2008). But the opinion of an expert is only as valid as the reasons or basis underlying the opinion. *Id.* As such, a party must lay a sufficient foundation to establish the reliability of the reasons for the expert's opinion. *Id.* Without such a basis, the opinion amounts to sheer speculation. *Wiedenbeck v. Searle*, 385 Ill. App. 3d 289, 293 (2008). If an expert's opinion is based on so many "uncertain factors that he is required to guess or surmise to reach an opinion,

the expert's opinion is too speculative to be reliable" and thus would not be admissible. (Internal quotation marks omitted.) *Maggi v. RAS Development, Inc.*, 2011 IL App (1st) 091955, ¶ 63.

¶ 164   Morgan was aware that Langholf had reported a turbo issue and knew of the associated symptoms reported by Langholf that were present at the time the truck pulled to the side of the road. Although Morgan was not a mechanic, he had more than 40 years' experience in the transportation safety business, which undoubtedly gave him a strong foundation from his experience into the inner workings of commercial vehicles. Given Morgan's extensive expertise coupled with the facts he knew about Langholf's truck and what had occurred, it was not unreasonable for the trial judge to conclude that Morgan had a sufficient basis to offer his opinion. Consequently, the trial judge did not abuse his discretion in allowing the opinion testimony of Morgan.

¶ 165                3. Howe's Motion *in Limine* No. 37

¶ 166   Lastly, Howe's motion *in limine* No. 37 sought to bar, in part, any claim that a violation of its purported internal policy requiring a driver to take a safety training course after a preventable accident but before receiving another dispatch established a standard of care that, if breached, constituted negligence. The trial judge denied the motion, finding that, because the motion judge had already deemed admitted the negligence allegation related to the online safety course, the issue had already been decided.

¶ 167   We have already concluded that the motion judge improperly sanctioned Howe by deeming this allegation of negligence admitted. Because the trial judge's rationale for denying this motion *in limine* was a sanction now deemed improper and we have found reversible error in connection with the trial judge's grant of plaintiff's motion *in limine* No. 32, Howe's motion *in limine* No. 37 will still be relevant on remand.

¶ 168   Whether a legal duty exists is ascertained by determining whether "parties stood in such a relationship to each other that the law imposes an obligation on one to act for the protection of the other." (Emphasis omitted.) *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 238 (1996). If the law does not establish a duty, "one will not generally be created by a defendant's rules or internal guidelines." *Id.*; see also *Blankenship v. Peoria Park District*, 269 Ill. App. 3d 416, 422 (1994) (holding a park district's internal policies requiring a lifeguard to be on duty at all times did not create a legal duty to have one on duty at all times); *Fillpot v. Midway Airlines, Inc.*, 261 Ill. App. 3d 237, 244 (1994) (holding an airline's policy manual that required the clearing of walkways did not create a legal duty to do so). Consequently, Howe's purported internal policy by itself of requiring a driver who had been involved in a preventable accident to complete a safety course prior to receiving another dispatch did not establish a standard of care that, if breached, constituted negligence.

¶ 169   However, regardless of any purported internal policy, employers do have legal duties to the public with respect to their employees that, if breached, constitute negligence, including the duty to only hire or retain competent employees and entrust vehicles to only competent drivers. See, *e.g.*, *Gomien v. Wear-Ever Aluminum, Inc.*, 50 Ill. 2d 19, 20, 24 (1971) (finding a plaintiff stated a cause of action where she alleged that an employer had a duty to users of the highway to exercise reasonable care in its selection of drivers, which was allegedly breached by hiring a habitually negligent driver); *Malorney v. B&L Motor Freight, Inc.*, 146 Ill. App. 3d 265, 268 (1986) (finding that an employer has a duty to hire and entrust vehicles to employees who are competent for the particular job and a "[l]ack of forethought may exist where one remains in voluntary ignorance of facts concerning the danger in a particular act or instrumentality, where a reasonably prudent person would become advised, on the theory that such ignorance is the

equivalent of negligence"). What these cases stand for generally is that, where an employer has knowledge, or reasonably should know, that its employee may pose a danger to the public, such notice may establish a legal duty that, if breached, constitutes negligence.

¶ 170   In other words, Howe's purported internal policy alone did not establish a legal duty (see *Rhodes*, 172 Ill. 2d at 238), but Langholf's record as a driver could have depending on his previous driving record. See *Gomien* 50 Ill. 2d at 20-24; *Malorney*, 146 Ill. App. 3d at 268. While one preventable accident by itself may not require an employer to have its employee undergo additional training before another dispatch, certainly a pattern of careless driving could. While from our review of the record, we are only aware of Langholf's preventable accident the week before the fatal collision at issue in this appeal, there may be other incidents of careless driving, which is something that can be explored on remand and whether Howe had a legal duty with respect to Langholf as a result. As such, the trial judge should consider all of these factors when deciding Howe's motion *in limine* No. 37 on the merits on remand.

¶ 171   In sum, a new trial is warranted based upon the trial judge's grant of plaintiff's motion *in limine* No. 32, which barred Green from testifying about Terrell being shirtless shortly before the accident and wearing a shirt shortly after the accident. This new trial should occur consistent with our additional finding that the motion judge improperly sanctioned Howe for a discovery violation by deeming Howe's negligence admitted for failing to require Langholf to complete a required safety course following his preventable accident but prior to him receiving another dispatch. And lastly, upon remand, the trial judge should consider Howe's motion *in limine* No. 37 on the merits.

¶ 172                                    III. CONCLUSION

¶ 173　For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed in part, reversed in part, and remanded for a new trial consistent with this opinion.

¶ 174　Affirmed in part and reversed in part; cause remanded with directions.