NOTICE
Decision filed 08/05/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250235-U

NO. 5-25-0235

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| BETH L. SMITH, | ) | St. Clair County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 18-D-783 |
| | ) | |
| STEVEN A. SMITH, | ) | Honorable |
| | ) | Tameeka L. Purchase, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Presiding Justice McHaney and Justice Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's order granting petitioner's motion to relocate and denying respondent's motion for additional parenting time is affirmed where the trial court's orders were not against the manifest weight of the evidence.

¶ 2    Respondent, Steven A. Smith, appeals the trial court's order granting petitioner, Beth L. Smith's, motion to relocate and denying his request for additional parenting time. For the following reasons, we affirm the trial court's orders.

¶ 3                            BACKGROUND

¶ 4    Beth filed for divorce from Steven on October 19, 2018, after six years of marriage. The parties have two children, R.S. and S.S. The petition alleged that Beth should receive all decision making and the majority of parenting time because Steven was being investigated by the Illinois

1

Department of Children and Family Services. The divorce was final on September 9, 2020, after the parties entered into a joint parenting agreement. Pursuant to the agreement, the parties shared decision making for the children who resided primarily with Beth. Steven received parenting time every other weekend and Wednesday evenings, holidays, and a week in the summer. Steven was ordered to pay $1,170 monthly in child support and $807 monthly for childcare. Both parents lived in Mascoutah, Illinois.

¶ 5     On April 20, 2023, Beth filed a notice of intent to relocate the children to St. Louis, Missouri. On May 2, 2023, Steven filed a motion to modify parenting time and child support. Steven's motion alleged that the children wanted to spend more time with him, Beth was late for most visits, and Beth was not properly caring for the children. On July 6, 2023, Beth filed a petition for permanent relocation. The parties were ordered to mediation, which was ultimately unsuccessful. A guardian *ad litem* (GAL) was appointed on August 3, 2023.

¶ 6     The GAL filed a report on July 1, 2024, that found a substantial change in circumstances that warranted modification, noting both the schedules and living arrangements of the parties and ages and desires of the children. The report stated that the children wanted to split time between their parents and did not want to move to St. Louis. They wanted to continue to attend school in Mascoutah and preferred to spend time with Steven instead of sitting at Beth's home with a babysitter. They also indicated that they did not get along with Beth's new husband and R.S. did not get along with the new husband's daughter. The GAL stated that Beth's house was cluttered, had soiled dog pee pads on the floor even when the dog had not been there, and the basement smelled like cat urine. The GAL stated that R.S. generally prepared the meals when Beth was at work and there were absence and tardiness issues with the children's school because Beth did not always wake up on time or called them in as "sick" when she did not feel like taking them to

2

school. The children also had tardies when they stayed at Beth's husband's house because he lived in Creve Coeur, Missouri. The GAL report also noted that Beth had concerns with Steven because he installed hidden cameras in the bedrooms and bathrooms of Beth's older daughters when they were married. The report stated the cameras were never used and the GAL believed Beth's concern was "disingenuous" because Beth had always allowed overnight parenting. After considering the statutory factors, the GAL recommended that Steven have equal parenting time and that Beth's request to relocate be denied. The case was set for trial on December 19, 2024.

¶ 7 On December 17, 2024, Beth filed a witness list for the upcoming hearing. Katherine Waller was included on the list. Steven filed a motion *in limine* requesting preclusion of Ms. Waller's testimony because she was only first disclosed as a potential witness two days before trial, was never disclosed in discovery prior to that time, and pursuant to Illinois Supreme Court Rule 218(c) (eff. Feb. 2, 2023), the disclosure was untimely because it was not provided 60 days prior to the hearing. Beth also filed a motion to allow the testimony of Allison Sweeney, despite the trial court previously granting Steven's motion to quash Ms. Sweeney's subpoena. According to Beth's motion, Allison Sweeney was the GAL in the family law case involving Steven's girlfriend that was pending in Missouri.

¶ 8 On December 17, 2024, the parties filed position statements pursuant to Local Rule 8.03. Steven requested more parenting time because: (1) the children wished to spend more time with him; (2) the children expressed concerns with Beth's new husband; (3) Beth did not inform him of the children's medical injuries; (4) Beth did not involve him in decision making; (5) Beth denied him right of first refusal; (6) Beth's work schedule made him more accessible to the children before and after school; and (7) he questioned the children's hygiene and diet. He further stated that he did not believe it was the children's best interest to relocate because they were in third and fifth

grade, had friends, were connected to the community, and involved in activities. He requested child support modification due to a change in parenting time.

¶ 9 Beth's position statement addressed the spy camera that was the basis of Beth and Steven's divorce, his misdemeanor charges stemming therefrom, the expired orders of protection, and the agreed parenting schedule. The position statement claimed the GAL report was "devoid of any investigation regarding Father's criminal charges, plea and potential effect on the minors herein," and claimed it blamed Beth. The statement further argued that after Steven's probation was completed, he again engaged in concerning behaviors with his girlfriend's daughter which prompted the Missouri GAL to request a restraining order prohibiting overnight visits with Steven's girlfriend and Steven from having any contact with his girlfriend's children. As such, Steven's girlfriend could not exercise her parenting time if Steven was in the home due to orders of protection in the girlfriend's pending family law case. The position statement requested removal of overnight visits with Steven, supervised visitation with Steven, and changes in how the children were exchanged.

¶ 10 On December 18, 2024, Steven moved to strike Beth's position statement. He argued the position statement was prohibited because none of Beth's pleadings requested any relief regarding parenting time. The motion also noted that Beth's motion to relocate stated that "the current schedule can be effectuated without interference."

¶ 11 A hearing was held on December 19, 2024. The pending motions were addressed first. Ms. Waller was classified as a rebuttal witness and the court stated it would allow her testimony. The court also allowed the change in Beth's requested relief as set forth in her position statement. The following testimony was provided at the hearing.

4

¶ 12    Brenda Asher testified that she was Steven's neighbor, and she would see him playing with the girls in the neighborhood. She provided additional testimony about Steven's girlfriend and times she witnessed Steven or his girlfriend in the neighborhood.

¶ 13    Steven testified that he had lived at his current address for nine years. He described his house, the people who lived there, the living arrangements, and his employment. He stated that the children always attended Mascoutah schools. R.S. was in advanced classes and involved in band and volleyball. S.S. enjoyed soccer. Both had friends at school. He was requesting more parenting time because the girls wanted to spend more time with him. He stated that he asked Beth for more parenting time, but she denied it. She would not let him have the girls during her "drill weekends" despite the right of first refusal in the parenting agreement. He also discussed his refusal to allow the children to go to Texas in 2023 because it would have caused him to lose his weekend and two Wednesdays at minimum, and possibly more, because Beth and the children usually took a month when they went to Texas. He stated that when the children went to Texas, they visited Brad and Rhonda Massey who had known the children since birth and were the children's first daycare providers. He also stated that his girlfriend, Chanda, could watch the children during the day for free, so paying daycare costs only wasted money. Steven stated he was also denied his right of first refusal when Beth went to Japan and that was when she was going to send the girls to Texas. He discussed how he and the girls spent time together, their homework, discipline and identified photographs of the children with his family. He testified about not being able to reach the girls to talk to them when they were home sick from school and Beth did not tell him about the illnesses. He further stated that Beth did not list him as an emergency contact at the children's school. He stated there were times the girls arrived for visits and their clothes were filthy and they had not showered since the preceding Sunday. He did not want the girls to move to St. Louis because they

were established in Mascoutah. They had schools, friends, enjoyed the town, and did not want to leave Mascoutah. They also did not like Beth's husband picking them up after visits.

¶ 14 On cross-examination, Steven addressed the fact that Mascoutah was a military town and agreed that people with children moved frequently. S.S.'s best friend recently moved but the girls continued to make new friends in those circumstances. He agreed that he never requested additional time from 2018 to 2023 but never refused it either. He did not like it when Beth dropped the girls off with other people because he would be available. He disagreed that any current legal document, either an order of protection or temporary restraining order, existed that prohibited Chanda's children from spending time with him. His feelings about Beth's husband were based on what the children said. He never spoke to him. He agreed that he was placed on probation in 2018 after pleading guilty to videotaping minors, who were Beth's 14- and 17-year-old daughters, when he put a camera in the shower the girls used and in their bedrooms. He agreed that he was on probation for 18 months for those charges. Despite his earlier statement, he agreed that Chanda's children were not allowed to spend time with him. He also clarified that Beth took her summer week of visitation before the children went to Texas. He stated they were supposed to go from July 21 to July 27 but ended up staying until August 1 and he only found out on his weekend. He disputed that he drank excessively.

¶ 15 Chanda Burns testified that she lived with Steven and worked with special education children at Mascoutah Middle School. She had two children but could not speak to the terms of her parenting time due to preclusions in Missouri. She also discussed a tattoo she was getting related to her own children and explained that the tattoo did not include Steven's children because they were not military children.

¶ 16    Beth testified that she was an RN working at Gateway Regional Medical Center. She retired from the reserves in February 2024. She worked Tuesdays, Wednesdays and Thursdays. She did not currently work weekends. She discussed issues she had with Chanda and Steven, along with her financial affidavit, Steven's land purchase in Alton, the relationship between her husband's child and R.S., and her husband's job. She also stated that the schools were good and provided the children with more extracurricular activities. She believed the children would adjust easily to the move noting that they were used to having friends move away due to military obligations.

¶ 17    James Waller testified that he was Beth's husband from 1999 to 2007. They had two children who were older than Steven and Beth's children. He worked for the State Appellate Defender's Office and represented Beth in her order of protection against Steven on behalf of Beth and James's children. He addressed the spy cameras designed to look like carbon monoxide and fire detectors that were installed in the shower and the children's bedrooms. The children were 13 and 17 at the time. He stated that Steven admitted to installing the cameras at the hearing and stated that he installed them because he had concerns that one of the girls was dumping food down the drain in the shower. James stated the plenary order of protection was granted. He opined that Steven was inebriated when he picked up the children, had micro-aggressions, was controlling, and was jealous.

¶ 18    Rhonda Massey testified that she started babysitting R.S. in 2014. She and her husband later moved to Texas but remained in contact with Beth and her children. She and her husband moved back from Texas in 2024, and she watched the children for Beth three days a week.

¶ 19    Karsten Kessler testified that he was Beth's current husband. He had one child from a previous relationship. He talked about trips he and Beth took with their children.

¶ 20    Katherine Waller is James and Beth's daughter. She was called as a rebuttal witness to address Steven's testimony about not drinking. She stated that before the cameras were found, she was already uncomfortable because Steven would come into the room to give massages late at night and get a little handsy. She did not tell her mom. She thought it was normal because she was only 12 at the time. She was concerned about Steven's drinking because he would fall asleep on the couch or leave the door open in the bathroom and be exposed, which was embarrassing. She did not think Steven should be around her sisters.

¶ 21    Steven was recalled and stated that his request for additional time with his children was not financially motivated. He stated that he only returned the girls early when he was concerned about them not getting enough rest for school. He thought the exchange time should be 7 p.m., not 9 p.m. He said his charges were for attempted video recording because the cameras were never turned on. On cross-examination, he stated that the cameras were forensically investigated by the Mascoutah Police Department and the State. He stated the forensics revealed there were no recordings, and the cameras were never turned on.

¶ 22    Megan Nolan, the GAL in this case, provided a recommendation to deny Beth's request to relocate and provide Steven with 50/50 parenting time. She stated that she did speak with the parties about the 2018 incident. She also spoke with the Missouri GAL twice and reviewed Steven's sex offender report. She did not believe that Steven was a threat to either of his children. She also spoke with Chanda's children and stated that none of the children were concerned about Steven. She also stated that Beth did not act concerned about Steven either. When she spoke to Beth, she just wanted to move to St. Louis. She had no issue with the current parenting time schedule. She noted that one of the children did not get along with Karsten's daughter. The GAL had no concerns with Beth's husband. Both of the children told the GAL that they wanted to spend

more time with Steven. They did not think it was fair that they spent more time with Beth. They hated being at home with the babysitter. The GAL admitted that she had not spoken to the girls since Rhonda took over babysitting. She stated that R.S. wanted to stay in Mascoutah and S.S. would "be fine doing anything." Both girls got great grades and were good students. She noted there were several tardies in the school records on Monday mornings and some Tuesdays when Beth had the girls.

¶ 23    Following the hearing, the trial court issued a written order on February 25, 2025, that granted Beth's request to move to St. Louis, set Steven's parenting time as every other weekend from 5:30 p.m. on Friday to Sunday at 9 p.m. and every Wednesday after school until 9 p.m. Holiday parenting time was set from 9 a.m. to 7 p.m. and the parties alternated holidays based on odd and even years. The order denied Steven's request for 50/50 parenting time and decreased his child support to $1,120.24. Steven appealed.

¶ 24                                ANALYSIS

¶ 25    Steven raises four issues on appeal. He first contends the trial court erred in denying his motion to strike Beth's position statement that modified her requested relief. He further argues that the trial court abused its discretion by denying his motion *in limine* related to Katherine Waller's testimony. Steven also argues that the trial court's decision to allow Beth to move to St. Louis was against the manifest weight of the evidence as was the denial of his request to modify parenting time. We address each in order.

¶ 26    Steven initially argues that the trial court's ruling on his motion to strike was in error because Beth's pleadings failed to request a parenting time change. Where a trial court's ruling on a motion to strike raises a question of law, our review is *de novo*. *Asset Recovery Contracting, LLC v. Walsh Construction Co. of Illinois*, 2012 IL App (1st) 101226, ¶ 101. Here, Steven claims

9

that denying his motion to strike placed the issue of parenting time before the court where Beth previously stated that she had no desire to change the current parenting time schedule if her relocation request was granted. While there is no dispute that a trial court is jurisdictionally precluded from addressing issues that are improperly presented (see *In re Marriage of Britton*, 2022 IL App (5th) 210065, ¶ 39), the issue of parenting time was presented by Steven and therefore, Beth's position statement addressing the issue was allowable. *In re Marriage of Oros*, 256 Ill. App. 3d 167, 170 (1994) ("Once the issue of custody was placed before the court, the court possessed broad discretion to alter custody or visitation rights to the extent required by the child's best interests.").

¶ 27 While we agree that a position change on an issue two days before a hearing may increase issues that need to be addressed at the hearing, the trial court did not adopt Beth's new position as to Steven's parenting time and Steven claims no harm arising from allowing the changed position. More importantly, Steven provides no legal basis for disallowing a party's position change on an issue before a hearing. Accordingly, we affirm the trial court's order denying Steven's motion to strike.

¶ 28 Steven next argues that the trial court abused its discretion by denying Steven's motion *in limine* as to Katherine Waller's testimony because Ms. Waller was not previously listed as a potential witness in Beth's discovery responses. "A trial court's denial of a motion *in limine* is reviewed under an abuse-of-discretion standard." *Noble v. Earle M. Jorgensen Co.*, 2013 IL App (5th) 120248, ¶ 21. An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable to such extent that no reasonable person would agree with it. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003).

¶ 29 In support, Steven relies on Illinois Supreme Court Rule 218(c), which states:

"All dates set for the disclosure of witnesses, including rebuttal witnesses, and the completion of discovery shall be chosen to ensure that discovery will be completed no later than 60 days before the date on which the trial court reasonably anticipates that the trial will commence, unless otherwise agreed by the parties." Ill. S. Ct. R. 218(c) (eff. Feb. 2, 2023).

In response, Beth cites *McCaley v. Petrovic*, 2024 IL App (1st) 230918, and argues that Illinois Supreme Court Rule 213 (eff. Jan. 1, 2018) contains no information regarding rebuttal witnesses or testimony

¶ 30    While we agree that in some cases, it will be difficult to determine the necessity of a rebuttal witness, since actual testimony is unavailable until the trial, such is not the case here. Given that Beth was able to include Ms. Waller as a witness prior to trial, and only claimed she was a rebuttal witness at the hearing on the motion *in limine*, the failure to disclose within Illinois Supreme Court rule parameters seems more intentional than inadvertent, especially given her testimony. Compliance with Illinois Supreme Court rules is mandatory and the " 'rules are not mere suggestions.' " *In re Denzel W*., 237 Ill. 2d 285, 294 (2010) (quoting *People v. Houston*, 226 Ill. 2d 135, 152 (2007)). Accordingly, we agree that the trial court abused its discretion by allowing Ms. Waller to testify.

¶ 31    Beth also argues, in the alternative, that if this court were to find the trial court's ruling was an abuse of discretion, this court should find harmless error. We agree. "[A]n evidentiary error does not automatically mandate reversal, as the error may nevertheless be harmless." *Inman v. Howe Freightways, Inc.*, 2019 IL App (1st) 172459, ¶ 157 (citing *Nolan v. Weil-McLain*, 233 Ill. 2d 416, 429 (2009)). "Harmless error occurs when, despite the presence of an error, it appears no

11

harm has been done." (Internal quotation marks omitted.) *Id.* Reversible error occurs if the error affects the outcome of the trial. *Id.*

¶ 32 Here, the trial court's decision does not address, weigh, determine the credibility, or even reference Ms. Waller's testimony. While the testimony controverted Steven's claim about his drinking, the trial court's decision was not based on Steven's drinking. Further, while Ms. Waller's testimony provided her feelings related to defendant and his placement of video cameras, Steven admitted placing the video cameras as part of his own testimony. Accordingly, we agree that while it was error by the trial court to allow Ms. Waller's testimony, the error was harmless.

¶ 33 Steven next argues that the trial court erred in granting Beth's petition to relocate the children to St. Louis. As noted in *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32, when "adjudicating a relocation petition, a trial court's paramount consideration is the best interests of the children." "[A] simple bright-line test" does not exist and each case must be determined on "the circumstances of each case." (Internal quotation marks omitted.) *Id.* The court also stressed that " '[a] trial court's determination of what is in the best interests of the child should not be reversed unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred.' " *Id.* (quoting *In re Marriage of Eckert*, 119 Ill. 2d 316, 328 (1988)). A determination "is against the manifest weight where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence." *Banister v. Partridge*, 2013 IL App (4th) 120916, ¶ 47. It is important to note that deference is afforded to the trial court because it "had significant opportunity to observe both parents and the child and, thus, is able to assess and evaluate their temperaments, personalities, and capabilities." (Internal quotation marks omitted.) *Fatkin*, 2019 IL 123602, ¶ 32. As such, there is a strong and compelling presumption in favor of the trial court's result. *Id.*

12

¶ 34     Section 609.2(g) of the Illinois Marriage and Dissolution of Marriage Act sets forth the factors for consideration when determining relocation requests. 750 ILCS 5/609.2(g) (West 2024). The factors include:

> "(1) the circumstances and reasons for the intended relocation;
>
> (2) the reasons, if any, why a parent is objecting to the intended relocation;
>
> (3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment;
>
> (4) the educational opportunities for the child at the existing location and at the proposed new location;
>
> (5) the presence or absence of extended family at the existing location and at the proposed new location;
>
> (6) the anticipated impact of the relocation on the child;
>
> (7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs;
>
> (8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation;
>
> (9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child;
>
> (10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and

13

(11) any other relevant factors bearing on the child's best interests." *Id.*

¶ 35    Steven argues that the trial court's decision was against the manifest weight of the evidence because no solid evidence regarding the schools in St. Louis was presented, the opportunities provided by St. Louis were still available from Mascoutah, and the court considered the wrong distance between Mascoutah and St. Louis along with the time required to traverse that distance. He further argues that the trial court's decision was contrary to the GAL's recommendation.

¶ 36    Although a GAL is "the eyes and ears of the court," there is no requirement that a trial court must follow a GAL's recommendation. (Internal quotation marks omitted.) *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 51. Here, the GAL's recommendation was based on her interviews with the children and their stated desires. As such, at most, the GAL's recommendation only directly addressed 1 of the 11 statutory factors.

¶ 37    Further, the trial court was faced with compelling evidence both in favor of and against the proposed relocation. It addressed each of the factors noting that both parents had close relationships with the children and the parties agreed that relocation would impact the children. Beth believed the children would adjust quickly, as they were used to having friends who lived on Scott Air Force Base moving in and out of the community. The court also noted that the GAL had not spoken to the children since the babysitter was replaced. The court found that eight of the statutory factors were applicable and that it was in the best interest of the children to allow the relocation. It noted Beth's concerns about Steven's past behavior, judgment, and parenting, which was clearly a reference to his prior misdemeanor case involving the placement of video cameras in the bathroom and bedroom of his stepchildren.

¶ 38    While additional evidence related to the quality of the St. Louis school and its extracurricular activities would be advantageous, Beth's testimony that the schools were good and

14

provided more extracurricular activities than the Mascoutah school was unrebutted. The record is silent as to the actual distance between Beth's current location and her proposed locale. We further note that Steven never asked Beth for the actual distance, or the time required to traverse the distance during his cross-examination. As such, we cannot find fault with the trial court's reliance on an approximate distance between Mascoutah and St. Louis. Given the evidence of record, the competing interests presented to the trial court, and the trial court's thorough consideration of the statutory factors, we cannot find the trial court's decision was against the manifest weight of the evidence.

¶ 39    Finally, Steven argues that the trial court erred in denying his request to modify his parenting time. We will not disturb a trial court's parenting time allocation unless "it is against the manifest weight of the evidence, is manifestly unjust, or is the result of an abuse of discretion." *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 21.

¶ 40    As with dispositions involving relocation, the circuit court's allocation of parenting time is based on the best interest of the children after consideration of the applicable statutory factors. See 750 ILCS 5/602.7(a)-(b) (West 2024). Those factors include:

"(1) the wishes of each parent seeking parenting time;

(2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

(3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth;

15

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any

16

treatment the offender has successfully participated in; the parties are entitled to a hearing on the issues raised in this paragraph (15);

(16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and

(17) any other factor that the court expressly finds to be relevant." *Id.* § 602.7(b).

As with relocation, there is a strong and compelling presumption in favor of the trial court's results. *In re Marriage of Jerome*, 255 Ill. App. 3d 374, 396 (1994); *In re Marriage of Simmons*, 221 Ill. App. 3d 89, 90 (1991).

¶ 41    The crux of Steven's argument contends the trial court failed to place sufficient weight on the GAL report. However, the trial court's order specifically included the findings of the GAL in its review of the statutory factors, noting that according to the GAL, the children wanted to spend more time with Steven. Further, the trial court specifically disagreed with the GAL's recommendation as to both parenting time and relocation and further found that supervision of Steven's parenting was inappropriate. As noted above, a trial court is not required to follow a GAL's recommendation. *Virgin*, 2021 IL App (3d) 190650, ¶ 51.

¶ 42    Steven also argues that the trial court relied too heavily on the criminal charges and his plea related thereto. However, the trial court simply noted the charge, found that Steven was not required to register as a sex offender for those charges and, after evaluation, was found to not require any treatment. Further, the court's findings were based on statutory factor 15 which required the court to consider Steven's history. While he argues that he testified that there were no restrictions from his seeing Chanda's children, he later testified to the opposite. Contrary to

Steven's argument, the trial court did not find that he was a danger to his daughters and refused to increase his parenting time for that reason. Instead, the order reveals that the trial court's decision was based on its consideration of the evidence in conjunction with the statutory factors. Accordingly, we cannot find that the trial court's order regarding parenting time was against the manifest weight of the evidence.

¶ 43                                  CONCLUSION

¶ 44     For the above-stated reasons, the trial court's order granting Beth's petition to relocate and denying Steven's motion to modify parenting time is affirmed.


¶ 45     Affirmed.